## Kellogg vs. The Chicago and Northwestern Railway Company.

| 26 | 223 |
| 79 | 145 |
| 26 | 223 |
| 85 | 297 |
| 26 | 223 |
| 96 | 357 |
| 97 | 286 |
| 26 | 223 |
| 115 | 139 |

Railroads—Negligence : *Liability of Railway Company for property destroyed by fire originating on its roadway, from its engine.—Duty to keep track free from grass, &c.—What questions of negligence for the jury.—Proximate and remote damage.*

1. Where sparks from defendant's engine set fire to dry grass, weeds and bushes, suffered to remain and accumulate on land used for the railway, and the fire, spreading upon plaintiff's lands, destroyed his property, the question whether defendant was negligent in leaving its land in that condition, was properly left *to the jury*.
2. It was not error, as against defendant, to submit to the jury the question whether plaintiff was also negligent in permitting dry stubble and grass to remain on his land, and in not having plowed a sufficient strip adjoining the railway to prevent the spread of the fire.
3. The fact that the fire would not have spread to the property destroyed unless the weather had been dry and the wind strong, does not affect defendant's liability.
4. The fact that the property destroyed was distant from defendant's road, and that the flame reached it only by passing through intervening fields, does not render the damages remote, or prevent a recovery.
5. Persons occupying farms along railroads are entitled to cultivate and use them in the manner customary among farmers, and may recover for damages by fire resulting from the negligence of the railway company, although they have not plowed up the stubble, or taken other like unusual means to guard against such negligence.
6. Negligence of the plaintiff, in such cases, which precludes a recovery, is where, in the presence of a *seen* danger (as where the fire has been set) he omits to do what prudence requires to be done under the circumstances for the protection of his property, or does some act inconsistent with its preservation. Where the danger is *not seen*, but anticipated merely, or dependent on future events (such as the future continuance of defendant's negligence), plaintiff is not bound to guard against it by refraining from his usual course (being otherwise a prudent one) in the management of his property and business.
7. In the exercise of his lawful rights, every person has a right to presume that every other will perform his duty and obey the law, and it is not negligence for him to assume that he is not exposed to a danger which can only come to him through a disregard of law on the part of some other person.
8. The maxim, *causa proxima non remota spectatur*, is not controlled by time or distance, nor by the succession of events. An efficient, adequate cause being found, must be deemed the true cause, unless some other cause, not incidental to it, but independent of it, is shown to have intervened between it and the result. The maxim includes liability for all actual injuries which were the natural and probable result of the wrongful act or omission complained of, or were *likely* to ensue from it under ordinary circumstances. *Ryan v. N. Y. Cen-*

Kellogg vs. The Chicago & Northwestern Railway Company.

*tral R. R.* (35 N. Y. 210), and *Pa. R. R. v. Kerr* (62 Pa. St. 353, or 1 Am. R. 431), examined and disapproved; *Perley v. Eastern R. R. Co.*, 98 Mass. 414, and others, approved and followed.

9. The drouth and high wind in this case *held* not to be *extraordinary*, but *ordinary* circumstances, within the meaning of this rule.

10. This court will not reverse for errors in the instructions or rulings of the court, where it is clear that the verdict and judgment could not have been different on the evidence.

11. If a party wishes the jury instructed upon a point not embraced in the general charge given, or if an instruction merely requires modification in some particular or particulars not materially affecting its general correctness, an exception thereto should be particular, so as to call the attention of the court to the precise point of objection.

Per PAINE, J., dissenting.

1. It cannot be said as a matter of law that a railway company is bound to keep its line of way clear of grass, weeds, etc., growing naturally thereon, since that would be impracticable or excessively burdensome; and there being no other proof of negligence on defendant's part, the question should not have been submitted to the jury.

2. If the jury were allowed to find defendant negligent in permitting combustibles to remain on its way, they should have been further instructed that plaintiff was also negligent in leaving like combustibles on his land, through which the fire reached the property destroyed, and that he could not recover.

3. Where the fire would not have reached the property in question *by the mere force of the conflagration*, but only in consequence of another intervening cause, as a violent wind, the damages should be held *remote*, and there should be no recovery.

APPEAL from the Circuit Court for *Rock* County.

This action was brought to recover damages for the destruction, by fire, of stacks of hay and straw, sheds, stable, etc., belonging to the plaintiff. The fire was communicated by sparks or coals from defendant's engine, to dry grass, weeds and willows, on its way (which extended about fifty feet on each side of its iron track); and it passed thence upon plaintiff's pasture and meadow land, and ran through dry stubble of grass and of grain, crossing a brook of about three feet wide, until it reached a hay-stack, and thence spread to the other stacks, and to the sheds and stable, which were about a hundred and forty rods from where the fire started. This occurred on the 9th day of November, which was shown to be usually a windy month in that region; and a strong wind was blowing

at the time, from the point where the fire originated, towards the property destroyed. The season was a dry one, and the grass, weeds and stubble were "very dry." Some part of the plaintiff's pasture land, over which the fire passed, was "boggy and uneven," and some willows were growing upon it. Along the edge of the brook where the fire crossed it, there was tall, dry grass. The plaintiff's evidence tended to show that where the fire began, defendant's land was uneven, and that the grass, weeds and willows had not been removed for years, if ever. Defendant's evidence tended to show that the company was in the habit of burning grass along the track every year, to diminish the danger of accidental fires; that it was customary to plant willows, or leave those growing wild, as a protection to the embankment against washing; and that where this fire originated, the embankment needed such protection.

The instructions given to the jury are sufficiently stated in the opinion of Chief Justice DIXON.

Verdict and judgment for the plaintiff; and defendant appealed.

*Pease & Ruger*, for appellant, argued, among other things:

1. That by statute 6 Anne, c. 31, § 6, as re-enacted and enlarged by statute 14 Geo. III, c. 78, s. 86, it was provided that " no action, suit or process whatever shall be had against any person in whose house, chamber, stable, barn or other building, *or on whose estate* any fire shall, after the 24th of June, 1774, accidentally begin; nor shall any recompense be made by such person for any damage thereby, any law, usage or custom to the contrary notwithstanding " (*Lansing v. Stone*, 37 Barb. 18); that these words were then construed to include fires negligently caused, and, in fact, all fires not wilfully or intentionally lighted (1 Black. Com. 431); that this, being the common law of England as amended by act of parliament prior to the American

Revolution, became a part of the common law of Wisconsin (Sedgw. on Stat. and Com. Law, 16, 17; *Lansing v. Stone, supra*; *Coburn v. Harvey*, 18 Wis. 147; *Ryan v. R. R. Co.*, 35 N. Y. 215–217); and that there is, therefore, in the absence of any statute of this state on the subject, no law for the maintenance here of actions like this. 2. That, upon the evidence, it did not appear that defendant ought to have kept its way, at the place in question, free from willows and grass, or that there was any reasonable and practicable method by which it could have been done. Mowing was impracticable, because the ground was rough and wet, and on account of the willows and brush; and it would have been entirely ineffectual, for the fire burned over the plaintiff's mowed ground even more rapidly than elsewhere. The ground was also too wet and rough for plowing; and converting the right of way, by plowing or in any other manner, into a non-inflammable belt, would increase the dust, to the great discomfort of the public, and prevent the convenient use of the railway. Such means would be disproportionate to the end; and they would impose a heavy burden without effectually accomplishing the object sought, since sparks, escaping despite all precaution, sometimes originate fires beyond the fifty feet limiting the right of way on each side of the track. Defendant had no facilities for plowing and mowing, and could have insured this partial security only by making the whole way a non-inflammable belt; while the plaintiff had the facilities at hand, and a few furrows, plowed in the ordinary course of his husbandry, would have insured perfect safety. Courts will hold this to be the duty of the land owner in such cases. *Henry v. R. R. Co.*, 30 Vt. 638; *Norris v. Railroad Co.*, 28 id. 99; *Hortsman v. R. R. Co.*, 18 B. Mon. 218. 3. The willows had been allowed to grow for the necessary protection of the embankment, and even if the grass had been of no service, its growth with the wil-

lows could not have been prevented. True, the roots are more specially serviceable for this purpose; but. plowing or burning would destroy these. Defendant had a right to preserve the vegetation for this purpose. *Carson v Railroad Co.*, 8 Gray, 423. The question of its necessity should not have been left to the jury. *Brainard v. Clapp*, 10 Cush. 6–12. 4. Defendant had only a right of way. Vegetation growing on the land, not necessary to its use for a railway, belonged to the plaintiff, and he might have maintained a suit for any interference with it. *Preston v. Railroad Co.*, 11 Iowa, 15; *Chapin v. Railroad*, 39 N. H. 570; *Lance's Appeal*, 55 Pa. St. 25, 26; 1 Redfield on R. W. 247–254; Angell on Highways, §§ 301, 303, 310. If, however, both parties had a *right* to remove it, it was clearly the *duty* of the plaintiff. Being lawfully and unavoidably exposed to danger, and having the right to use the very precaution he claims should have been taken for his protection, the burden should fall upon him. 5. Counsel arged that the plaintiff was guilty of contributory negligence in not removing the dry grass, etc., in his field adjoining the track, by plowing or otherwise, and so preventing the spread of an accidental fire on defendant's way; citing *M. & W. R. R. v. McConnell*, 27 Ga. 481 (26 U. S. Dig. "Railroad," note 4); *Carson v. R. R. Co.*, 8 Gray, 423; *Barry v. Lowell*, 8 Allen, 129; *Fitchburg R. R. Co. v. B. & M. R. R.* 3 Cush. 88; Cooley's Cons. Lim. 384, 543. They urged that farmers along the line of railways cannot, without negligence, make precisely the same uses of all parts of their land which might be made without negligence in case of lands remote from such roads; that persons who enjoy the advantages of these new agents of civilization must bear the burden in part of the increased care required to guard against the dangers which they necessarily create; and that the compensation paid by the railway company for the right of way, must be assumed to have included payment for

such increased care on the land-owner's part. *Angell on Carriers*, 489; *Babcock v. R. R. Corp.*, 9 Met. 553; *Norris v. R. R. Co.*, 28 Vt. 99; *Hortsman v. Railroad Co.*, 18 B. Mon. 218; *Boothby v. R. R. Co.*, 51 Me. 318. 5. The damages were too remote for a recovery. *Ryan v. R. R. Co.*, 35 N. Y. 210; *Hooksett v. Concord R. R.*, 38 N. H. 242; *Henry v. R. R. Co*, 30 Vt. 638; *Fitz-simonds v. Inglis*, 5 Taunt. 534; *Knight v. Wilcox*, 14 N. Y. 413; *Ashley v. Harrison*, 1 Esp. 48; *Ward v. Weeks*, 7 Bing. 211; *Loker v. Damon*, 17 Pick. 284; *Mott v. R. R. Co.*, 1 Rob. (N. Y.) 586, 593, 594; *Bank v. Bank*, 17 Mass. 1–5, 29–32.

*Williams & Sale*, for respondent, to the point that the question of defendant's negligence was properly submitted to the jury, cited *Illinois Central R. R. Co. v. Mills*, 42 Ill. 407; *Bass v. Ch. B. & Q. R. R. Co.*, 28 id. 18; *Ohio & M. R. R. v. Shanefelt*, 47 id. 497. 2. They also argued that the plaintiff had used his land in the way all farmers do; had during that year mowed his meadow land, pastured the pasture land, and culti-vated the plow land, and there was no such *accumula-tion* of combustible matter on his land as was shown to have existed on defendant's land; and therefore the court could not properly have instructed the jury that if they found defendant guilty of negligence they must hold plaintiff also to have been negligent. 3. They contended that the damage shown was the natural and probable result of a fire being kindled on the track under the circumstances; and therefore was proxi-mate and not remote. *Thomas v. Winchester*, 2 Seld. 408; *Field v. Railroad*, 32 N. Y. 339; *Scott v. Shepherd*, 2 Wm. Blacks. 893.

DIXON, C. J.    All the authorities agree that the presence of dry grass and other inflammable material upon the way of a railroad, suffered to remain there by the company without cause, is a fact from which the jury may find negligence against the company.    The

cases in Illinois cited and relied upon by counsel for the defendant hold this. They hold that it is proper evidence for the jury, who may find negligence from it, although it is not negligence *per se*. *Railroad Co. v. Shanefelt*, 47 Ill. 497; *Illinois Central Railroad Co. v. Nunn*, 51 id. 78; *Railroad Co. v. Mills*, 42 id. 407; *Bass v. Railroad Co.*, 28 id. 9. The court below ruled in the same way, and left it for the jury to say whether the suffering of the combustible material to accumulate upon the right of way and sides of the track, or the failure to remove the same, if the jury so found, was or was not, under the circumstances, negligence on the part of the company. No fault can be found with the instructions in this respect; and the next question is as to the charge of the court, and its refusal to charge, respecting the alleged negligence of the plaintiff contributing, as it is said, to the loss or damage complained of. This is the leading and most important question in the case. It is a question upon which there is some conflict of authority.

The facts were, that the plaintiff had permitted the weeds, grass and stubble to remain upon his own land immediately adjoining the railway of the defendant. They were dry and combustible, the same as the weeds and grass upon the right of way, though less in quantity, because within the right of way no mowing had ever been done, and the growth was more luxuriant and heavy. The plaintiff had not cut and removed the grass and weeds from his own land, nor plowed in or removed the stubble, so as to prevent the spread of fire in case the same should be communicated to the dry grass and weeds upon the railroad, from the engines operated by the defendant. The grass, weeds and stubble upon the plaintiff's land, together with the wind, which was blowing pretty strongly in that direction, served to carry the fire to the stacks, buildings and other property of the plaintiff, which were destroyed by it, and which were situated some dis-

tance from the railroad. The fire originated within the line of the railroad, and near the track, upon the land of the defendant. It was communicated to the dry grass and other combustible material there, by coals of fire dropped from an engine of the defendant passing over the road. The evidence tends very clearly to establish these facts, and under the instruc-. tions the jury must have so found. The plaintiff is a farmer, and, in the particulars here in controversy, conducted his farming operations the same as other farmers throughout the country. It is not the custom anywhere for farmers to remove the grass or weeds from their waste lands, or to plough in or remove their stubble, in order to prevent the spread of fire originating from such causes.

Upon this question, as upon the others, the court charged the jury that it was for them to say whether the plaintiff was guilty of negligence, and, if they found he was, that then he could not recover. On the other hand, the defendant asked an instruction to the effect that it was negligence *per se* for the plaintiff to leave the grass, weeds and stubble upon his own land, exposed to the fire which might be communicated to them from the burning grass and weeds on the defendant's right of way, and that for this reason there could be no recovery on the part of the plaintiff. The court refused to give the instruction, and, I think, rightly. The charge upon this point, as well as upon the other, was quite as favorable to the defendant as the law will permit, and even more so than some of the authorities will justify. The authorities upon this point are, as I have said, somewhat in conflict. The two cases first above cited from Illinois hold that it is negligence on the part of the adjoining land owner not to remove the dry grass and combustible material from his own land under such circumstances, and that he cannot recover damages where the loss is by fire thus communicated. Those decisions were by a divided court, by two only

of the three judges composing it. They rest upon no satisfactory grounds, whilst the reasons found in the opinions of the dissenting judge are very strong to the contrary. Opposed to these are the unanimous decisions of the courts of New York, and of the English court of exchequer, upon the identical point. *Cook v. Champlain Transportation Co.*, 1 Denio, 91; *Vaughan v. Taff Vale Railway Co.*, 3 Hurl. and Nor. 743; *Same v. Same*, 5 id. 679. These decisions, though made many years before the Illinois cases arose, are not referred to in them. The last was the same case on appeal in the exchequer chamber, where, although the judgment was reversed, it was upon another point. This one was not questioned, but was affirmed, as will be seen from the opinions of the judges, particularly of COCKBURN, C. J., and WILLES, J. The reasoning of those cases is, in my judgment, unanswerable. I do not see that I can add anything to it. They show that the doctrine of contributory negligence is wholly inapplicable—that no man is to be charged with negligence because he uses his own property or conducts his own affairs as other people do theirs, or because he does not change or abandon such use, and modify the management of his affairs, so as to accommodate himself to the negligent habits or gross misconduct of others, and in order that such others may escape the consequences of their own wrong, and continue in the practice of such negligence or misconduct. In other words, they show that no man is to be deprived of the free, ordinary and proper use of his own property by reason of the negligent use which his neighbor may make of his. He is not his neighbor's guardian or keeper, and not to answer for his neglect. The case put by the court of New York, of the owner of a lot who builds upon it in close proximity to the shop of a smith, is an apt illustration. Or let us suppose that A. and B. are proprietors of adjoining lands. A. has a dwelling house, barns and other buildings upon his, and cultivates some portion of it.

B. has a planing mill, or other similar manufacturing establishment, upon his, near the line of A., operated by steam.    B. is a careless man, habitually so, and suffers shavings and other inflammable material to accumulate about his mills and up to the line of A., and so near to the fire in the mill that the same is liable at any time to be ignited.    A. knows this, and remonstrates with B., but B. persists.    Upon A.'s land, immediately adjoining the premises of B., it is unavoidable, in the ordinary course of husbandry, or of A.'s use of the land, that there should be at certain seasons of the year, unless A. removes them, dry grass and stubble, which, when set fire to, will endanger his dwelling-house and other property of a combustible nature, especially with the wind blowing in a particular direction at the time.    It may be a very considerable annual expense and trouble to A. to remove them.    It may require considerable time and labor, a useless expenditure to him, diverting his attention from other affairs and duties.    The constant watching to guard against the carelessness and negligence of B. is a great tax upon his time and patience.    The question is: Does the law require this of him, lest, in some unguarded moment, the fire should break out, his property be destroyed, and he be remediless?    If the law does so require, if it imposes on him the duty of guarding against B.'s negligence, and of seeing that no injury shall come from it, or, if it does come, that it shall be his fault and not B.'s, it is important to know upon what principle it is that the burden is thus shifted from B. to himself.    I know of no such principle, and doubt whether any court could be found deliberately to announce or affirm it.    And yet such is the result of holding the doctrine of contributory negligence applicable to such a case.    A. is compelled, all his life-time, at much expense and trouble, to watch and guard against the negligence of B., and to prevent any injuries arising from it, and for what?

Simply that B. may continue to indulge in such negligence at his pleasure. And he does so with impunity. The law affords no redress against him. If the property is destroyed, it is because of the combustible material on A.'s land, which carries the fire, and which is A.'s fault, and A. is the loser. No loss can ever possibly overtake him. A. is responsible for the negligence, but not he himself. He kindles the fire, and A. stands guard over it. He sets the dangerous element in motion, and uses and operates it for his own benefit and advantage, negligently as he pleases, whilst A., with sleepless vigilance, sees to it that no damage is done, or if there is, that he will be the sufferer. This is the *reductio ad absurdum* of applying the doctrine of contributory negligence in such a case. And it is absurd, I care not by what court or where applied.

Now the case of a railroad company is like the case of an individual. Both stand on the same footing with respect to their rights and liabilities. Both are engaged in the pursuit of a lawful business, and are alike liable for damage or injury caused by their negligence in the prosecution of it. Fire is an agent of an exceedingly dangerous and unruly kind, and, though applied to a lawful purpose, the law requires the utmost care in the use of all reasonable and proper means to prevent damage to the property of third persons. This obligation of care, the want of which constitutes negligence according to the circumstances, is imposed upon the party who uses the fire, and not upon those persons whose property is exposed to danger by reason of the negligence of such party. Third persons are merely passive, and have the right to remain so, using and enjoying their own property as they will so far as responsibility for the negligence of the party setting the unruly and destructive agent in motion is concerned. If he is negligent, and damage ensues, it is his fault and cannot be theirs, unless they contribute

to it by some unlawful or improper act. But the use of their own property as best suits their own convenience and purposes, or as other people use theirs, is not unlawful or improper. It is perfectly lawful and proper, and no blame can attach to them. He cannot, by his negligence, deprive them of such use, or say to them, " Do this or that with your property, or I will destroy it by the negligent and improper use of my fire." The fault, therefore, in both a legal and moral point of view, is with him, and it would be something strange should the law visit all the consequences of it upon them. The law does not do so, and it is an utter perversion of the maxim *sic utere tuo*, *etc.*, thus to apply it to the persons whose property is so destroyed by the negligence of another. It is changing it from " So use your own as not to injure another's property," to " So use your own that another shall not injure your property," by his carelessness and negligence. It would be a very great burden to lay upon all the farmers and proprietors of lands along our extensive lines of railway, were it to be held that they are bound to guard against the negligence of the companies in this way—that the law imposes this duty upon them. Always burdensome and difficult, it would, in numerous instances, be attended with great expense and trouble. Changes would have to be made in the mode of use and occupation, and sometimes the use abandoned, or at least all profitable use. Houses and buildings would have to be removed, and valuable timber cut down and destroyed. These are, in general, very combustible, especially at particular seasons of the year. The presence of these along or near the line of the railroad would be negligence in the farmer or proprietor. In the event of their destruction by the negligence of the company, he would be remediless. He must remove them, therefore, for his own safety. His only security consists in that. He must remove every thing combustible from his own land in order

that the company may leave all things combustible on its land and exposed without fear of loss or danger to the company to being ignited at any moment by the fires from its own engines. If this duty is imposed upon the farmers and other proprietors of adjoining lands, why not require them to go at once to the railroad and remove the dry grass and other inflammable material there ? There is the origin of the mischief, and there the place to provide securities against it. It is vastly easier, by a few slight measures and a little precaution, to prevent the conflagration in the first place, than to stay it ravages when it has once begun, particularly if the wind be blowing at the time, as it generally is upon our open prairies. With comparatively little trouble and expense upon the road itself, a little labor bestowed for that purpose, the mischief might be remedied. And this is an additional reason why the burden ought not to be shifted from the company upon the proprietor of the adjoining land; although, if it were otherwise, it certainly would not change what ought to be the clear rule of law upon the subject.

And the following cases will be found in strict harmony with those above cited, and strongly to sustain the principles there laid down, and for which I contend: *Martin v. Western Union Railroad Co.*, 23 Wis. 437; *Piggott v. Eastern Counties R. R. Co.*, 54 E. C. L. 228; *Smith v. London and Southwestern R. R. Co.*, Law Reports, 5 C. P. 98; *Vaughan v. Menlove*, 7 C. & P. 525 [32 E. C. L. 613]; *Hewey v. Nourse*, 54 Me. 256; *Turberville v. Stampe*, 1 Ld. Raym. 264; *S. C.* 1 Salk. 13; *Pantam v. Isham*, id. 19; *Field v. N. Y. C. R. R.*, 32 N. Y. 339; *Bachelder v. Heagan*, 18 Maine, 32; *Barnard v. Poor*, 21 Pick. 378; *Fero v. Buffalo and State Line R. R. Co.*, 22 N. Y. 209; *Fremantle v. The London and Northwestern R. R. Co.*, 100 E. C. L. 88; *Hart v. Western Railroad Co.*, 13 Met. 99; *Ingersoll v. Stockbridge & Pittsfield R. R. Co.*, 8 Allen, 438; *Perley v.*

*Eastern Railroad Co.*, 98 Mass. 414; *Hooksett v. Concord Railroad*, 38 N. H. 242; *McCready v. Railroad Co.*, 2 Stobh. Law R. 356; *Cleaveland v. Grand Trunk Railway Co.*, 42 Vt. 449; 1 Bl. Comm. 131; Com. Dig. Action for Negligence (A, 6).

It is true that some of these cases arose under statutes creating a liabllity on the part of railroad companies, but that does not affect the principle. Negligence in the plaintiff, contributing to the loss, is a defense to an action under the statutes, the same as to en action at common law. 8 Allen, 440; 6 id. 87.

And the other objections against the liability of the company, that the fire set by its negligence was the *remote* and not the *proximate* cause of the injury done to the plaintiff, because his property consumed was situated from sixty-five to one hundred rods from the place where the fire started, and because there was a strong wind blowing in that direction at the time, are, in my opinion, equally untenable. The same objections were taken in several of the cases above cited, and overruled, and might have been taken in most of the others, if they had been considered legitimate grounds of defense. It would be strange indeed, if the liability of a party for the negligent destruction of property by fire were to depend upon the fact whether he set fire at once to the property, or whether he set fire to some other combustible material at some distance from it, but communicating with it, and which, it was apparent at the time, would inevitably, or almost inevitably, lead to its destruction. It was apparent in this case, almost as apparent and certain before the fire was set, that, if set at the time and under the circumstances, it *would* prove destructive of the property of the plaintiff or of others, as it was afterwards that it *had* so proved. It required no prophetic vision to see this. It was a matter within the common experience of mankind. There were the "natural and ordinary means" at hand, by which it

must prove so destructive. 13 Met. 104. Those means extended directly and continuously from the place where the burning coals from the engine first touched the dry grass and weeds on the company's road, to the plaintiff's stacks, buildings and other property. There were the dry grass, weeds and stubble communicating with the property, and the wind blowing in the direction of it. And this condition of things had existed for sometime, and had been suffered to exist by the company. No steps had been taken to remove the dry grass and other inflammable substances from the roads, which, if they had been removed, would have prevented the injury. In this the company was at fault, and it was its sole fault, so far as can now be known, that the injury took place. It may be that the wind did not always blow, or in the same direction; but at that season of the year the times of calm were the exception. The wind was liable and likely to blow, and greatly to enhance the danger, at any time. The company, or its agents and employees, knew this, and were bound to increased care on that account. And the argument that because the wind blew at the time, or because the same negligence might not have produced the injury if the atmosphere had been calm, therefore, the company is not liable, is certainly a very odd way of reasoning upon such a subject. The argument is neither more nor less than this: that the greater the tendency and exposure to damage from negligence, the less the care and circumspection required by law to guard against or prevent such damage. In other words, that the obligation of diligence decreases in proportion as the necessity for its exercise increases. The company may neglect its duty, and set fires and destroy property, on a windy day or night when the danger is increased, and it shall not be liable; whereas, if it do the same thing at a time when the wind is not blowing and the danger is diminished, it shall be liable. It

may be that this mode of reasoning merits the compliment of ingenuity in the endeavor to avoid the liability of a party for wrongs committed by him, but it clearly cannot be sound. The authorities all repudiate it, and it requires no effort of one's natural sense of reason and justice to do so. The winds and the dryness and combustibility of the substances upon the surface of the land are what create the danger, and impose upon the company the obligation of care and circumspection in the use and management of its fire. It is impossible to separate the idea of such obligation or duty from these natural causes or agencies from which it arises. If the materials on the surface of the earth never became dry and combustible, and the winds never blew, the obligation would never have existed. It springs from these natural causes and agencies, and is an obligation to guard against the evil effects produced by them, by the employment of such reasonable means and appliances as will prevent the escape or communication of the fire. To say, therefore, that the obligation ceases to exist, or that the party using the fire is justified in omitting the means or appliances to prevent its escape or communication, because of the presence of such natural causes or agencies, is to lose sight entirely of the ground upon which the obligation rests. The argument, if it proves anything, proves that there exists no obligation or duty at all in any such case. It disproves itself by proving too much.

But we are referred to the case of *Ryan v. New York Central Railroad Co.*, 35 N. Y. 210, and the recent one in the supreme court of Pennsylvania, *The Pennsylvania Railroad Co. v. Kerr*, 4 Western Jurist, 254; 62 Pa. St. 353 (*S. C.* 1 American R. 431), as having a bearing favorable to the company upon the questions here presented. The facts of those cases so entirely distinguish them from the present, that it seems hardly necessary to comment upon them. The point decided

in each case was, that when fire is negligently communicated to one building, and it destroyed, and subsequently another distinct and separate building is set fire to and destroyed by sparks from that, the negligent party is not liable in damages for the destruction of the latter building. In those cases the buildings were the property of different owners, and not contiguous to each other. In deciding them, the courts professed to act on the maxim *causa proxima non remota spectatur;* and in the last one the court say: "The maxim, however, is not to be controlled *by time or distance, but by the succession of events."* The point was, that the burnings were distinct and separate, a series of events succeeding one another. In the present case there was but one burning, one continuous conflagration from the time the fire was set on the railroad until the plaintiff's property was destroyed. The combustible material extended and the ground was burned over, all the way from the railroad to the plaintiff's property; and the fire, driven by the wind, was carried to his property in that manner. There was no distinct or separate setting fire to or burning of the stacks or buildings, and then a communication of the fire by sparks through the air from one stack or building to another. There was no succession of events, but only one event.

The facts of this case are altogether like those of the case of *Field v. N. Y. C. R. R., supra,* which is referred to approvingly in *Ryan v. New York Central R. R. Co.* It was not the intention of the court, therefore, in the latter case, to overrule the former, which, like the present, is clearly distinguishable.

But the doctrine of those cases has not received the unanimous assent of the courts. It is directly opposed by the decisions in Massachusetts and New Hampshire, above cited. In 98 Mass. 414, the case was where fire was set by a spark from an engine to grass near the track, and spread in a direct line, without any break,

across land of several different proprietors, and a highway, to the woodland of the plaintiff, half a mile distant from the railroad, and burned large quantities of wood.   It was held that the railroad company was responsible.   In that case, the case of *Ryan v. New York Central Railroad Co.* was cited, and the court commented upon it as follows: " In that case a distinction is made between proximate and remote damages. The fire was communicated from defendant's locomotive to their woodshed, and thence, by sparks, one hundred and thirty feet, to the plaintiff's house; and it was held that the plaintiff could not recover, because the injury was a remote and not a proximate consequence of the carelessness of the defendants in permitting their fire to escape.   Our own cases above referred to, are not noticed in the opinion.   Nor does the opinion draw any line of distinction between what is proximate and what is remote; and such a line is not obvious in that case.   If, when the cinder escapes through the air, the effect which it produces upon the first combustible substance against which it strikes, is proximate, the effect must continue to be proximate, as to everything which the fire consumes in its direct course.   This is so, whether we regard the fire as a combination of the burning substances with the oxygen of the air, or look merely at its visible action and effect.   As matter of fact, the injury to the plaintiff was as immediate and direct as an injury would have been which was caused by a bullet, fired from the train, passing over the intermediate lots, and wounding the plaintiff as he stood upon his own lot.   It is as much so as pain and disability are proximate effects of an injury, though they occur at intervals, through successive years after the injury was received.   Yet these are called proximate effects, though the actual effects of the injury may be greatly modified, in every case, by bodily constitution, habits of life, and accidental circumstances."

And it is worthy of remark, too, that in the Pennsylvania case, as well as the New York one, there is no reference to the Massachusetts decisions, nor to the English common law cases there cited.

The exception to the charge directing the jury to allow interest on the damages, is not urged here. It was held, in the case of *Chapman et al. v. Chicago and Northwestern Railway Co.*, just decided, that such direction was proper.

I am of opinion, therefore, upon the whole case, that there was no error of which the defendant can justly complain, and that the judgment should be affirmed.

Cole, J. I concur with the chief justice that there was no error in the rulings of the court below.

Paine, J. Unless a railroad company is bound to keep its entire roadway free from grass or other matter naturally growing upon it, which, when dry, would be combustible and liable to ignite by sparks or coals from the engine, I think there was no evidence of negligence in this case upon which to submit the question to the jury. The legal question, therefore, is, whether such an obligation rests upon the company. Where the facts are undisputed, the question what amounts to negligence is one of law. And a court cannot in such a case, while declining to take the responsibility of saying that the facts show negligence, refer it to the jury and allow them to say so. That is allowing the jury to decide the legal question.

I think there is no material dispute as to the condition of the roadway at the spot where the fire was kindled. It was on a marsh, and there were some willows and high grass between the track and the line of the right of way. They had grown there naturally, and no combustible material had been placed there by any artificial means. And the only

negligence was in not removing, by some means, this natural growth of grass and weeds and brush. I do not think, upon the facts here presented, that this was negligence. I will not deny that a case might be supposed where it would be negligence not to remove such combustible matter. But it would be a case where the obligation would grow out of the peculiar surroundings and the fact of the practicability of such removal without extraordinary and disproportionate effort and expense. Thus, if there were valuable property in the immediate vicinity, which would naturally and probably be destroyed, if a fire should accidentally be kindled in such dry grass, and it was practicable to remove it so as to prevent that probability by reasonable effort and care, it might be negligence to suffer it to remain. But there were no such surrounding circumstances here. There was nothing to suggest the probability of a loss arising from a fire occurring at this spot any more than there would be at any spot along the road. The plaintiff's property that was destroyed was about a half a mile distant. To reach it, the fire had to run over about sixty-five rods of marsh that had been mowed by the plaintiff, crossing on its way a small brook; and then run over stubble-fields the remainder of the distance. It was improbable that a fire, if kindled, would spread to such a distance over such ground. And it would doubtless not have done so, except for the unusual drouth and the occurrence of a very strong wind. I can therefore see no reason for submitting to the jury the question of negligence in leaving the dry grass in the roadway where this fire originated, unless it is negligence in law for a company to leave any dry and combustible material on any portion of its right of way. That such is the law, I cannot hold. It is true that, although an extreme drouth is not the ordinary condition of things, yet it sometimes occurs—although there is not generally a high wind blowing, yet there

frequently is. And if the possible concurrence of these two events with a fire kindled on defendant's road without any negligence on its part, except leaving on the side of it the grass and weeds naturally growing there, made it negligence to leave them there, then it must be negligence for any railroad company to leave any combustible material anywhere on its right of way. Such a rule would be unreasonable. It would be so because it is impracticable to keep the line of a railway free from matter which, in a drouth, would be combustible, without an effort and expense that would be so great as to be intolerable. The ground on either side of the track to the line of the right of way is generally rough and broken, so as to make it impossible either to plow or to mow it in such a manner as to prevent the presence of dry grass and weeds. In marshes the surface is generally so uneven that it cannot be mowed closely enough to prevent leaving a considerable amount of grass, which, in a drouth, would be combustible. This the evidence of the plaintiff in this case clearly shows. He had mowed a large part of his marsh adjoining the spot where the fire originated, and yet he testifies that the fire ran more rapidly over that grass stubble than it did over his grain stubble. I do not believe, therefore, that it would be possible to keep the line of a railway free from combustible matter without the constant employment of a large force for that purpose, and in many places constantly digging up the surface of the ground by hand labor. Such an obligation would be disproportionately burdensome and oppressive. It would be much more reasonable, as has been done in some states, to pass a statute making the companies absolutely liable for all damages by fire originating from the engine within certain limits, and giving them an insurable interest in all property for which they would be liable.

Companies are justly and reasonably held to the

use of great vigilance in the management of their engines, and to procure the most approved means for preventing accidents by fire.  But after they have done this, to say that they must go so far as actually to keep their entire roadway free from dry grass, weeds, leaves and other combustible matter, or else be held guilty of negligence, is, I think, unreasonable and extravagant.  I cannot see why the same reasoning would not require them to build iron or stone fences and buildings along their road, because wooden fences and buildings are combustible, and, as everybody knows, are frequently set on fire.  The answer to such a requirement is, that although fires sometimes happen in that way, yet they are the exception ; and therefore, unless there are special circumstances suggesting an unusual necessity for such extreme caution, it is not negligence for the companies to use the ordinary fencing and building material.  And the same answer is applicable to the grass and weeds growing on the road.

But if this is not so, if to leave them on the roadway constitutes negligence, necessarily, in the company, I am at a loss to see how the same facts cease to constitute negligence as soon as you pass the company's line, and get on to the land of the adjoining proprietor.  Can it be negligence for the company to leave grass and weeds on its line, because if a fire should occur there it might run through the grass and weeds on the adjoining proprietor's land, and reach his buildings a half a mile distant, and yet no negligence at all for that proprietor, knowing all the facts, to leave the same kind of grass and weeds on his land, by means of which alone could the fire do him any serious damage ?

I do not think, upon the facts here presented, there was sufficient ground for imputing any negligence to the plaintiff.  On the contrary, the probability of damage in case a fire should occur at the spot where

this originated, was so slight, that no negligence ought to be imputed to the company or the plaintiff. But they stand or fall together. The same reasoning that finds one guilty of negligence, necessarily convicts the other. They were both confessedly guilty of the same acts or omissions—that is, suffering dry grass and combustible matter to remain on their land in a dry time and in a strong wind. If, therefore, it was negligence in one, it was in the other. And as the facts were undisputed, the same rule which would hold the company guilty would prevent a recovery by the plaintiff, on the ground of contributory negligence, unless in such cases the general, well-established rule that contributory negligence of the plaintiff, producing the injury, prevents a recovery, is wholly inapplicable. That rule is uniformly applied in all cases of other injuries caused by railroad companies, and I know of no reason why it should not equally be applied here. Thus, it would hardly be maintained by any one that, in such a case, after the fire had started, the owner could stand idly by, with the means of preventing its spread, and, without using them, allow it to run across his fields and consume his buildings and other property, and then recover. It would clearly be a want of ordinary care and prudence to neglect then to use such means. Suppose this fire had occurred when there was no wind, and yet that it might have run across the plaintiff's stubble and reached his barn, unless he had taken means to stop it. Suppose he could, by plowing a few furrows along the edge of his stubble field, have stopped it, and he had ample time to do so, would he not have been bound to do it? I think so, clearly, even though the fire had been caused by the actual negligence of the company in not using proper means to prevent its escape from the engine. And if this is so, it shows that the adjoining owner is not absolved from the general duty devolving upon every one to use ordinary care and prudence to avoid

and prevent injury from the negligence of others.
Where he is thus placed in the presence of a fire kin-
dled by the negligence of the company, his obligation
to use such reasonable means of prevention of damage
as are within his reach, is clearly illustrated, and the
fact of negligence, if he should neglect to use them, is
very apparent. It is true that in such a case he could
not be charged with negligence for not having resorted
to means of prevention before the fire occurred, be-
cause he would not be bound to anticipate the negli-
gence of the company in kindling the fire. Where
such negligence consists in the improper construction
or management of the engines, no one can foresee
when or where the fire will occur. The owner, in
such case, has nothing to put him upon his guard, so
as to require any unusual precaution until it is actu-
ally kindled. But the same answer cannot be made
here. Here there was no negligence in the manage-
ment or construction of the engine. All the most
approved means for preventing fires were used. The
negligence consisted wholly in leaving combustible
grass and weeds on the roadway in a dry time. This
the plaintiff knew; he saw it. He had ample oppor-
tunities to take measures to guard against damage
from it; but, instead of doing so, he was himself guilty
of the same negligence by leaving the same combus-
tible matter on his own land. It seems to me, there-
fore, that when it is once established that it is negli-
gence for a company to leave dry grass and weeds on
its roadway, and they are so left, and the fact is
known to the adjoining owner, he is then in the same
position as he would be if a fire had been kindled on
or near his premises, in respect to his obligation to
use reasonable care to avoid injury. He sees, in both
cases, the negligence of the other party, and the dan-
ger to himself. And I know of no reasoning upon
which he could be held bound to use such precaution-
ary measures as ordinary care and prudence would

suggest, to prevent injury to himself from such negligence in the one case, which would not be equally applicable to the other.

I do not believe that the owners of lands adjoining railways are bound to keep their lands clear from dry grass and weeds, or other combustible matter, under penalty of being chargeable with negligence. I do not hold that they are bound to discontinue the ordinary beneficial use of their property, even though such use might increase somewhat the hazard from fire. That was the principal of the decision in *Martin v. W. U. R. R. Co.*, 23 Wis. 437, in which I fully concurred. But it by no means follows that no act of such owners can be negligence, merely because it is such as they have a legal right to perform on their own lands. Thus, suppose such an owner, having plenty of room to stack his hay and grain elsewhere, should stack it all immediately adjoining the railway. Would it not be a plain act of negligence? It seems to me so, and that it cannot be said that such owners may invariably act as though no railroad was there, without being guilty of negligence. On the contrary, I think they furnish no exception to the general rule, that all persons are bound to use ordinary care to prevent injury from negligence of others. And so soon as it is established to be negligence in a railroad company to leave the dry grass and weeds upon its land, because, if a fire should occur, it might run across the adjoining owner's stubble-field, and reach his buildings, it follows necessarily that if plowing a narrow strip on those fields would prevent the loss, and he, after knowledge of the danger, neglects to plow it, he should be held guilty of a want of ordinary care. To say that he should have taken that precaution does not deprive him of the ordinary or beneficial use of his property. It does not impose upon him any burden or serious inconvenience. It is usual for farmers to plow their land in the fall. Plowing is an effectual preventive of the spread of fire.

And it could hardly be matter of serious consequence to a farmer whether he plowed a strip sufficient for this purpose, at one time or another. To determine the degree of negligence in such cases, regard should be had to the facility and effectiveness of the means of prevention which the parties respectively possess. And I think it more clear that an owner, whose buildings are only endangered by reason of the liability of fire to run a half mile across his stubble-fields to reach them, is guilty of negligence if he neglects the simple precaution of plowing a strip sufficiently wide to prevent it, which he might do without any serious burden or inconvenience, than that the railroad company was negligent in not removing the entire dry grass and weeds upon its line, which, as already suggested, could only be done at so great expense as to make it really impracticable.

I think, therefore, upon the undisputed evidence in the case, if it was the duty of the court to submit to the jury the question of the defendant's negligence, it should have told them that it was their duty, if they found the defendant negligent, to have found that the plaintiff had also been guilty of such negligence as would prevent a recovery. And in these views I am fully supported by the late cases in Illinois, referred to in the opinion of the chief justice.

I think, also, that the damages were too remote to form the basis of a recovery. In holding this, I do not wish unnecessarily to adopt the conclusion of the late Pennsylvania and New York cases referred to in the opinion of the court. They hold that where one building is set on fire by negligence, and the fire is communicated from that to another, the burning of the latter is the remote and not the proximate consequence of the negligence, and therefore, there can be no recovery for it. Without examining the question elaboretely, I will simply say that it seems to me, that where a fire is negligently kindled, the destruc-

tion of whatever is in such a situation as to burn by the mere force of the conflagration, without other intervening cause, is the direct and proximate consequence of the negligence. If this were not so, if fire should be negligently set to a long pile of wood or lumber, it might be said that only the sticks or boards first kindled were lost by the proximate consequences of the negligence, and that, as the fire passed from them to the others, the damage for the loss of all the rest would be remote. But where such a fire is kindled, and, by reason of some other intervening cause, it is carried or driven to objects which it would not otherwise have reached, the destruction of such objects would fairly seem to be a remote consequence of the negligence, and within the principle upon which the cases last referred to might be sustained, if their facts were such as to make it applicable. Thus, if a person should negligently set fire to a building in which powder was stored, and the explosion of the powder should throw fragments of the burning building to other buildings that would not otherwise have been reached, and set them on fire; or, if an unusual gale of wind should carry such fragments to a distance, with the same result—the damage for the loss of such other buildings might justly be said to be remote. This principle was clearly applicable here. It is evident that, except for the strong gale of wind, the fire would not have crossed the brook, and would not have reached the plaintiff's barn. While, therefore, it seems questionable whether the facts in those cases warranted the application of the principle, the facts in the present case do warrant it. And the principle itself furnishes an intelligible line of demarcation between those consequences of negligence in kindling fires for which the party is responsible, and those for which he is not.

I think the judgment should be reversed.

*By the Court.*—Judgment affirmed.

The defendant company moved for a rehearing.

*Pease & Ruger*, for the motion, argued that defendant had a right to suffer willows, grass or other vegetation to grow along the roadway, if necessary to its protection or convenient use (*Carson v Railway*, 8 Gray, 423); that the judgment of its officers as to their necessity is conclusive, unless clearly unreasonable (*Brainard v. Clapp*, 10 Cush. 6); that the evidence showed clearly that such a necessity existed in this case, at the place where the fire originated, and the jury should not have been allowed to find the contrary; and that plaintiff, having charged negligence in failing to remove the vegetation, was bound to show that its existence there was unnecessary and that its removal was practicable by means that might reasonably be required, but had made no attempt to show either.    2. That in regard to defendant's alleged negligence, the proper question was, whether its failure to remove the vegetation from its roadway was negligence *in respect to the property of plaintiff actually destroyed*, and not whether it was negligence in reference to some other property adjoining the road (*Barron v. Eldridge*, 100 Mass. 460, 461); and that in determining this question, the test is, that the injury might reasonably have been expected as the natural and probable result, *under ordinary circumstances*, of the wrongful act; and where the alleged negligence consists in a *continuous* omission of some duty, whereby the happening of an event which may prove injurious is rendered possible, the injury must be such as would result from such event under ordinary circumstances (*McDonald v. Snelling*, 14 Allen, 294, 295; *Kerr v. Railway*; *Ryan v. R. R. Co.*, 35 N. Y. 210; *Calkins v. Barger*, 44 Barb. 424; *Fahn v. Reichart*, 8 Wis. 255; *Hoey v. Felton*, 103 E. C. L. 142; *Daniels v. Potter*, 19 id. 375, and opinion of TINDAL, C. J.); and that this view of what would constitute negligence rendering defendant liable in this action was ignored in the instructions given to the jury, and also in the foregoing opinion.

3. That the injuries for which a recovery can be had in such cases are only such as are the *proximate*, as well as the natural, consequences of the alleged negligence (Sedgw. on Dam., 4th ed. 66 ; *Vedder v. Hildreth*, 2 Wis. 429 ; *Walker v. Ellis*, 1 Sneed, 515 ; *Donnell v. Jones*, 13 Ala. 490) ; and that in determining whether the negligence was the proximate or remote cause of the injuries complained of, the true test is, *not* whether there were several successive *events* between them, but whether there were intermediate or secondary *causes* over which the defendant had no control, and which were not bound together by a natural and necessary connection, or were not of such a kind that the defendant, in the exercise of ordinary prudence, was bound to foresee their probable co-existence and concurrence in producing the injury in question (*Scott v. Shepherd*, 2 W. Black. 893 ; *Vandenburgh v. Truax*, 4 Denio, 464 ; *Guille v. Swan*, 19 Johns. 381 ; Shearman and Redfield on Neg. 34 ; *Crain v. Petrie*, 6 Hill, 522–524 ; *McDonald v Snelling*, 14 Allen, 294 ; *Field v. R. R. Co.*, 32 N. Y. 339 ; and *Fero v. R. R. Co.*, 22 id. 209) ; that it was therefore a great mistake to argue this cause as though the defendant had wilfully or negligently set fire to the vegetation on its track at the time when the injury was done, and in view of the facts then actually existing ; that applying the rule above defined to this case, even admitting that there was a continuous omission of duty on the part of defendant in failing to remove the vegetation at this point from its track, still there were several intervening causes between that and the injury complained of, viz.: (1.) A period of extreme drouth. (2.) A violent wind. (3.) That wind blowing across the track directly toward the property destroyed. (4.) Rank vegetation on plaintiff's land, sufficient, with the aid of the drouth and wind, to carry the flames across the intervening stream ; that these secondary causes were not under defendant's control, were not bound together by any natural or

necessary connection, and were not such that defendant could foresee their probable co-existence and concurrence in producing the result which actually followed; and that its alleged negligence was therefore only the *remote* cause of the injury. Counsel also referred to *Stucke v. R. R. Co.*, 9 Wis. 215, as clearly holding the same doctrine. 4. They contended that the jury should not have been allowed to find defendant guilty of negligence in permitting the vegetation to grow on its track at that place, and plaintiff free from contributory negligence in permitting the same kind of vegetation to grow on his adjoining land; that the proposition that a man may remain passive in the presence of a known danger, against the threatened consequences of which he may easily guard, and then recover for the loss, merely because that danger was created wholly or in part by the negligence of another, is contrary to the clear and well established doctrine of the law (*Railway Co. v. Shanefelt*, 47 Ill. 497; *Ill. C. R. R. Co. v. Frazier*, id. 505; *Fero v. R. R. Co.*, 22 N. Y. 209; *Ross v. R. R. Co.*, 6 Allen, 87; *Smith v. R. R. Co.*, 37 Mo. 287; *Aldridge v. R. W. Co.*, 42 E. C. L. 276, opinion of MAULE, J.; *Root v. R. R. Co.*, 18 Barb. 80); and that where the injury is caused by the *remote* negligence of *each* party, there can be no recovery (*Stucke v. R. R. Co.*, 9 Wis. 215; *Button v. R. R. Co.*, 18 N. Y. 254–260; Pierce on Am. R. R. Law, 348–350; *Johnson v. R. R. Co.*, 20 N. Y. 74; *Tuff v. Warman*, 94 E. C. L. 585).*

The following opinion was filed September 21, 1871:

DIXON, C. J. The argument in support of the motion for a rehearing is certainly most able and dignified, and brings out with the greatest clearness and force all that can well be said in opposition to the

---

* Some specific criticisms by the counsel upon the first of the foregoing opinions, will sufficiently appear from the opinion on the motion for a rehearing.                                               REP.

views expressed by the majority of the court. Courtesy and a sense of our own obligation require this statement. It is no small privilege, but one greatly to be esteemed, when, upon questions of this nature, which are comparatively new and as yet unsettled by many direct authorities, the court is required to retrace its steps and verify the correctness of its conclusions, or to acknowledge its errors, in the light of such an argument. And thus, though our views remain unchanged, our thanks are still due to counsel for the ability and learning they have displayed and the assistance they have rendered in the investigation and decision of the important questions involved in the action.

It is not the purpose of this opinion to re-examine, or again to discuss at any length, the questions which were considered in the former one. They were there so fully considered as to make this unnecessary and improper. A statement of the points adhered to, with some additional reasons, may be proper; and some consideration of those raised on the motion and now first pressed upon our attention, and of the authorities relied on, seems also to be required.

The position that there was negligence on the part of the railway company in not removing the dry grass and other combustible material from the track, or evidence tending strongly to show and from which the jury might find it, is still adhered to.

It was negligence of that continuous kind spoken of by the learned counsel as " consisting in the omission to perform a duty, whereby the happening of an event which may prove injurious is rendered possible," and which they frankly concede the authorities declare to be actionable, *provided* " the damages be such as would result from the event under *ordinary* circumstances," or such as are the *natural and proximate* consequence of the act or omission complained of. It was, therefore, present negligence, or negligence existing at

the time of the injury, and by which it was produced, as much so as if at that time, or immediately before, the company had caused or permitted the dry grass and other inflammable substances to be placed upon the track, well knowing the dangerous tendencies of such act or permission, and the injurious consequences which might ensue to the property of others from the taking and communication of the fire. All the cases agree that the presence of such combustible material upon the track, where, with the utmost precautions to guard against the escape of sparks and burning coals from the engine, it is subject to and frequently does take fire, and where there is nothing incombustible upon the line of the company's road and between its land and the lands of adjoining proprietors to prevent the spread of fire or stay the mischief, is a circumstance from which the fact of negligence may be found by the jury. The company act with full knowledge of the peril, and knowingly assume the risk. In *Vaughan vs. Taff Valley Railway Co.*, cited in the former opinion (3 H. & N. 743), the judge told the jury that he was prepared to decide that the defendants were liable, and he directed them, that if, to serve his own purposes, a man does a dangerous thing, whether he takes precautions or not, and mischief ensues, he must bear the consequences ; that running engines which cast forth sparks is a thing intrinsically dangerous, and that if a railway engine is used which, in spite of the utmost care and skill on the part of the company and their servants, is dangerous, the owners must pay for any damage occasioned thereby. His lordship pointed out to them that by keeping the grass on the banks of the railway close cut, or by having the banks formed of gravel or sand so as to make a non-inflammable belt, all danger might be avoided ; and he asked them whether they did not think there was inevitable negligence in the use of a dangerous thing calculated to do, and which did cause mischief. And this direction

was sustained by the court in bank, on a rule to show cause why a new trial should not be granted, and approved on appeal to the exchequer chamber.

And the majority of the court also still adheres to the position that the failure of the plaintiff to remove the dry grass or stubble from his own land in order to prevent the spread or communication of fire set by the default or misconduct of the defendant, was not wrongful and improper on his part, not a culpable omission of duty by which he may be said to have co-operated in the destruction of his own property. We still think that the law imposed no such duty upon him.    In the exercise of his lawful rights, every man has a right to act on the belief that every other person will perform his duty and obey the law; and it is not negligence to assume that he is not exposed to a danger which can only come to him through a disregard of law on the part of some other person. *Jetter v. New York & Harlem R. R. Co.*, 2 Keyes, 154; *Earhart v. Youngblood*, 27 Pa. St. 332.    The rule of law on this subject, sustained by numerous authorities, is well stated in Shearman and Redfield on Negligence, sec. 31, as follows : " As there is a natural presumption that every one will act with due care, it cannot be imputed to the plaintiff as negligence that he did not anticipate culpable negligence on the part of the defendant.    Nor even where the plaintiff sees that the defendant has been negligent, is he bound to anticipate all the perils to which he may *possibly* be exposed by such negligence, or even to refrain absolutely from pursuing his usual course on account of risks to which he is *probably* exposed by the defendant's fault.    Some risks are taken by the most prudent men; and the plaintiff is not debarred from recovery for his injury, if *he has adopted the course which most prudent men would take under similar circumstances.*    And see particularly *Newson v. Railroad Co.*, 29 N. Y. 390; *Ernst v. Railroad Co.*, 35 N. Y. 28; *Railroad Co. v. Ogier*, 35 Pa. St. 60; *Clayards v.*

*Dethick*, 12 Q. B. 439 ; and *Johnson v. Belden*, 2 Lansing, 437. And in section 6, the same authors correctly observe that the law makes no unreasonable demands; that no one is guilty of culpable negligence by reason of failing to take precautions which no other man would be likely to take under the same circumstances, even though, if he had used them, the injury would certainly have been avoided. In *Vaughan v. Taff Vale Railway Co.*, last above cited, it appeared that in the plaintiff's wood adjoining the railway, " there was a great quantity of dry grass, of a highly inflammable nature. The wood had frequently been set on fire by sparks from the locomotives, and on four occasions the defendants had paid for the damage. In 1853 [the fire in question having occurred in 1856], the plaintiff wrote to the secretary of the company : ' No fire was known in the memory of man in the wood before the ·Aberdon Railway was made ; since it has been made, four or five times the wood has been ignited. Any one looking at it can easily satisfy himself that in a *dry season* the wood is *just about as safe a state as a barrel of gunpowder at Cyforthfa Rolling Mill.*' The plaintiff had taken no steps to clear away the accumulation of dry grass and fallen branches in the wood." Upon this evidence the judge refused to leave the question to the jury, " whether the plaintiff had not been guilty of negligence in permitting the wood to be in a combustible state by not properly clearing it," saying, that he thought there was no duty on the part of the plaintiff to keep his wood in any particular state." This ruling was affirmed on the proceeding to show cause against a new trial, in the following language by BRAMWELL, B., delivering the judgment of the court: " It remains to notice another point made by the defendants. It was said that the plaintiff's land was covered with very combustible vegetation, and that he contributed to his own loss, and Mr. Lloyd very ingeniously likened the case to that of an overloaded

barge swamped by a steamer. We are of opinion this objection fails. *The plaintiff used his land in the natural and proper way for the purposes for which it was fit. The defendants come to it, he being passive, and do it mischief.* In the case of the overloaded barge, the owner uses it in an unnatural and improper way, and goes in search of the danger, having no right to impede another natural and proper way of using a public highway. We therefore think the direction was right, the verdict satisfactory, and the rule must be discharged."

The learned counsel strongly combat this position, and argue that, if logically carried out, the doctrine would utterly abrogate the rule that a party cannot recover damages where, by the exercise of ordinary care, he could have avoided the injury; and so, in the present case, after discovering the fire, the plaintiff might have leaned on his plow-handles and watched its progress, without effort to stay it, where such effort would have been effectual, and yet have been free from culpable negligence. The distinction is between a known, present or immediate danger, arising from the negligence of another—that which is imminent and certain, unless the party does or omits to do some act by which it may be avoided, and a danger arising in like manner, but which is remote and possible or probable only, or contingent and uncertain, depending on the course of future events, such as the future conduct of the negligent party, and other as yet unknown and fortuitous circumstances. The difference is that between realization and anticipation. A man in his senses, in face of what has been aptly termed a " seen danger " (Shearman and Redfield, § 34, note 1), that is, one which presently threatens and is known to him, is bound to realize it, and to use all proper care and make all reasonable efforts to avoid it, and if he does not, it is his own fault; and he having thus contributed to his own loss or injury, no damage can be recovered

from the other party, however negligent the latter may have been. But, in case of a danger of the other kind, one which is not " seen," but exists in anticipation merely, and where the injury may or may not accrue, but is probable or possible only from the continued culpable negligence of another, there the law imposes no such duty upon the person who is or may be so exposed, and he is not obliged to change his conduct or the mode of transacting his affairs, which · are otherwise prudent and proper, in order to avoid such anticipated injuries or prevent the mischiefs which may happen through another's default and culpable want of care.

But the question chiefly discussed in the argument of counsel, and which may be said to be a new one, being now first presented, is, whether the damages sustained were the *natural and proximate* result of the negligence complained of, or whether the omission to remove the dry grass and vegetation from the railway track was negligence *with respect to the property of the plaintiff which was destroyed by the fire.* The questions whether the damages sustained were the natural and proximate result of the act or omission complained of, whether such act or omission constituted negligence with respect to the property injured, and whether the same was or was not the remote cause of the injury, within the maxim *causa remota non spectatur,* all depend upon the same considerations, and come to one and the same point of inquiry. They are different modes of stating the same proposition or subject of investigation. This question was incidentally alluded to in the former opinion in connection with two recent decisions, one in New York and the other in Pennsylvania. *Ryan v. New York Central Railroad,* 35 N. Y. 210, and *Pennsylvania Railroad v. Kerr,* 63 Pa. St. 363 (1 American R. 431). It is principally, if not altogether, upon the authority of those decisions that the point is now urged, that the damages were remote, and, therefore,

not recoverable. It was thought sufficient on the former occasion, to distinguish those cases from the present with respect to the principle upon which they obviously proceeded, and which was expressly stated in the latter to be, that the maxim *causa proxima non remota spectatur* was "not to be controlled by time or distance, *but by the succession of events*." Upon that principle, not conceding or denying its correctness, we thought the cases fairly distinguishable. Counsel arraign our views of those cases, and of the principle upon which they were decided, and say that "events intervening between the act complained of and the injurious consequence for which compensation is sought, are at the same time both causes and results; and the remark quoted refers to these events as causes and not as results. The damage caused by the burning of the second building was, in that case, held remote, not because it stood second in the order of results; but, as in the case of *Ryan,* for the reason that it was the result of an intervening cause, *not necessarily following the first*." How far counsel may be correct in this, will appear from a perusal of the opinions. A careful examination of them by ourselves discovers no such qualification of the principle as that the burning of the second building must be a result *not necessarily following the burning of the first*, or, as expressed by counsel, "the result of an intervening cause *not necessarily following the first*." The facts of both cases, and the entire reasoning of the judges, seem to us very clearly to show that such was not the view and understanding of the courts, but that the intention was to affirm, as a naked, unqualified principle of law, that for the burning of the second building which takes fire from the first, whether necessarily so or not, under ordinary circumstances, or under any circumstances, the party negligently setting fire to the first is not responsible; that for such second burning, as a mere second or succeeding event, without refer-

ence to its necessary connection with and dependence upon the first, the law imposes no liability upon the party negligently causing the burning of the first. This we understand to be the doctrine of succession of events established by those decisions, and upon which it was held that the application of the maxim alone depended.   Each burning, including the first, is the immediate cause of that which follows, and all are remote as to the wrong-doer, except the first or very building, structure or thing to which he negligently applies the torch.   The first fire causes the second, and the second the third, and so on, under all circumstances, and therefore, all after the first are not caused by the wrong-doer.   He causes only the first, and for that only can be held responsible.   To show that this is a correct exposition and true statement of the principle established, let us briefly examine the decisions.   The facts in *Kerr's case*, as stated in the opinion, were as follows : " A warehouse of one Simpson, situate very near the track of the company's road, was set on fire by sparks emitted from a locomotive engine of the defendants, so negligently placed as to set it on fire. The burning of the warehouse communicated fire to a hotel building situated some thirty-nine feet from the warehouse, which, at the time, was occupied by the plaintiff as a tenant, and it was consumed with its furniture, stock of liquors and provisions ; and for this the plaintiff sued and recovered below.   Several other disconnected buildings were burned at the same time, but this is in no way involved in the case." Such is a statement of the facts, and the entire facts upon which the court professed to adjudicate and to rely. We notice, in the first place, the statement that " the burning of the warehouse *communicated the fire to a hotel building* situated some thirty-nine feet," etc. Next we notice there is no allusion in the opinion, from first to last, to any other circumstance, ordinary or extraordinary, such as the blowing of the wind or

dryness of the season, intervening at the time as a cause or event tending to increase the danger or to carry or communicate the fire to the hotel building. And, further, we observe that there is no language in the opinion expressing, and none implying, the qualification of fact or of principle, that the burning of the hotel building did *not necessarily follow* the burning of the warehouse, or was *not an ordinary and necessary* consequence thereof. On the contrary, from the facts as stated, the proximity of the buildings, and the reasons and illustrations given by the court, the inference very clearly is, that the burning of the hotel *was the ordinary, natural and necessary* result of setting fire to and burning of the warehouse. The opinion says: "It is an occurrence undoubtedly frequent, that, by the careless use of matches, houses are set on fire. One adjoining is fired by the first, a third by the second, and so on, it might be for the length of a square or more. It is not in our experience that the first owner is liable to answer for all the consequences. And there is good reason for it. The second and third houses, in the case supposed, were not burned by the direct action of the match; and who knows how many agencies might have contributed to produce the result? Therefore, it would be illogical to hold the match chargeable as the cause of what it did not do, and might not have done." Now, what means this reasoning and illustration, if not intended to sustain the proposition immediately afterwards broadly laid down, that it is the succession of events which controls the application of the maxim? Why put, for the sake of illustration, the case of a building *adjoining* the building fired, and to which the fire would communicate itself *by the mere force of the conflagration*, without the aid of the atmosphere to float or the wind to blow the sparks and coals? Why say that the second and third houses, in the case supposed, were not burned by the direct action of the match, if it be not to

limit the liability of the party negligently applying the match to pay for damage to that house alone as the first in the order of destruction, or in the series or succession of events, the burning of each owner's house being regarded as an event by itself? It is true, the question is asked, "and who knows how many agencies *might* have contributed to produce the result?" From this we imply that because some other agencies, known or unknown, natural or artificial, *may* have contributed, and, indeed, *must* have contributed to produce the result, therefore the person by whose wrong the fire was set and these agencies called into action must escape, and the innocent sufferer from that wrong go unrequited. The oxygen of the air combining with the burning substances is such an agency. It produces the fire, and the fire produces the loss or destruction of the building; but the efficient cause of both the fire and the loss is the wrong of the individual who sets the fire. We consider the rule, or the application of the maxim, as having been correctly stated by THOMAS, J., in *Marble vs. City of Worcester*, 4 Gray, 412: "Having discovered an efficient, adequate cause, that is to be deemed the true cause, unless some new cause, not incidental to, but independent of, the first, shall be found to intervene between it and the result." And surely it would seem to us, the combination of the oxygen, the communication of the fire by the mere force of the burning to the adjoining buildings or to those so near to that first fired as that they would ordinarily be consumed, and the floating of the sparks and burning coals through the air, must, if new causes, be regarded as *merely incidental* to the first or efficient cause. They spring naturally and inevitably out of it, and cannot be regarded as *independent* of it, And, so too, in a country where winds generally prevail, and this motion of the air may almost be said to be its normal condition, so that sparks and coals of fire will float or

be carried to a greater distance, and where seasons of dryness are frequent and ordinary, rendering all combustible things highly susceptible of ignition from contact with sparks and burning coals, must these not also, if regarded as causes, be considered such only as are incidental to the main, first cause? Do they not come in aid of it merely, rendering it the efficient agent of destruction? Certainly as independent causes they are powerless, and could not produce the mischief, and it is only as incidental to the first cause that they may be said to contribute in producing it. They are natural and ordinary conditions merely, by which that cause is made effective, and it seems hardly proper to speak of or regard them as causes in such connection.

And again, in the extract above made, what was intended by the conclusion that it would be illogical to hold the match chargeable as the cause of what it did not do, and might not have done, if not to hold that the negligent party is responsible for the first house burned, and not for any other, regardless of all other considerations? And does not the conclusion also show that if by the possible co-operation of any other agency, natural or artificial (not that some new and independent cause *must* be found), the second house is destroyed, the wrong-doer is not chargeable, merely because such destruction is a second or succeeding event, and for no other reason? We must confess our inability to put any other construction upon the language.

And furthermore, we can conceive of no more unmistakable evidence of the doctrine held by the court, and upon which the decision proceeded, than is found in that part of the opinion quoted by counsel in their argument, and which is as follows: "It cannot be denied but the plaintiff's property was destroyed, but by a secondary cause, namely, the burning of the warehouse. The sparks from the locomotive did not ignite

the hotel.    They fired the warehouse, and the warehouse fired the hotel.    They were the remote cause—the cause of the cause of the hotel being burned.    As there was an intermediate agent or cause of destruction, between the sparks and the destruction of the hotel, it is obvious that that was the proximate cause of its destruction, and the negligent emission of sparks the remote cause.    To hold that the act of negligence which destroyed the warehouse, destroyed the hotel, is to disregard the order of sequences entirely, and would hold good if a row of buildings a mile long had been destroyed.    The cause of the destruction of the last, in that case, would be no more remote, within the meaning of the maxim, than that of the first; and yet, how many concurring elements of destruction there might be in all of these houses, and no doubt would be, no one can tell.    So to hold would confound all legitimate ideas of cause and effect, and really expunge from the law the maxim quoted, that teaches accountability for the natural and necessary consequences of a wrongful act, and which should, in reason, be only such that the wrong-doer may be presumed to have known would flow from his act."    Comment upon this language seems scarcely admissible for the purpose of making the meaning and intention of the court more clear, that it is " the order of sequences," or, as previously stated in the opinion, " the succession of events," which determines the application of the maxim.    The sparks from the locomotive fired the warehouse, and the burning of the warehouse fired the hotel; and therefore the firing of the warehouse was not the cause of the firing of the hotel.    This is the logic.    It was the burning of the warehouse, and not the wrongful setting fire to it, which caused the destruction of the hotel, no matter how *naturally, necessarily* or *inevitably even,* under any circumstances, the destruction of the latter may have followed from the wrongful act of firing the former.    It is the order of

sequences or succession of events which controls. The burning of each building, structure or thing having a separate existence, use, name or ownership, is an event by itself, and each event a cause by itself, which cause alone is to be considered as producing the next event or cause in the series, or as the proximate cause of it, regardless of the relation of one event to another, or of the necessary, natural or inevitable dependence of any or all of them upon the first cause or wrongful act of the party to be charged. Courts and juries are precluded by the maxim, and must shut their eyes to the natural and ordinary relation of things, or of cause to effect, and looking only to spark or match must follow that, and, seeing what building or substance that ignited, must determine that the destruction of such building or substance alone was the result of the wrongful act. If there be other buildings or substances immediately connected with that to which the spark or match is applied, or so situated as that they must necessarily be and are consumed by the fire, they become and are intermediate agents or causes of their own destruction, and destroy themselves or each other. The building first fired is such an agent or cause with respect to that to which the fire is directly communicated from it. The warehouse was, in the language of the court, such "an intermediate agent or cause of destruction" with respect to the hotel. It was the warehouse that destroyed the hotel, and not the act of setting fire to the warehouse. It is true, that towards the close of the extract the court speak of accountability for the "natural and necessary consequences of a wrongful act;" but it is obvious they exclude and prevent such accountability by the interpretation given the maxim, and the definition of proximate and remote in the relation of causes to the effects produced—by arbitrarily establishing the rule, and holding that the

burning of the first building is the only natural and necessary consequence of the wrongful act.

And if we turn to the case of *Ryan*, we shall find no material difference in the facts, nor in the reasoning or conclusion of the court. There is no allusion in it to any extraordinary circumstances existing at the time, contributing to the destruction of the plaintiff's house. It is not stated that the wind was blowing with unusual violence, nor that it was blowing at all, in the direction of the house, nor that the weather was dry. In the absence of any statement of either, as a circumstance affecting the case or influencing the judgment, it is fair to presume that neither existed. It is fair to presume, therefore, and must be presumed, that the burning of the house was the natural and probable consequence of the setting fire to and burning of the woodshed with the wood therein, under ordinary circumstances, or circumstances the most favorable to the defendant, such as a still day and no dryness of the shingles or materials of which the house was composed, so as to increase the danger. It is true, it is stated that the house was one hundred and thirty feet from the shed, but it is also stated that there was *a large quantity of wood* in the shed, and that the house *soon took fire from the heat and sparks*, and was entirely consumed, *notwithstanding diligent efforts were made to save it;* from which we infer that the destruction of the house by fire was naturally and necessarily involved in the burning of the shed with the large quantity of wood therein, under any circumstances. The opinion states the facts as follows: " On the 15th day of July, 1854, in the city of Syracuse, the defendant, by the careless management, or through the insufficient condition, of one of its engines, set fire to its woodshed and a large quantity of wood therein. The plaintiff's house, situated at a distance of one hundred and thirty feet from the shed, soon took fire from the heat and sparks, and was entirely consumed, notwithstanding

diligent efforts were made to save it. A number of other houses were also burned by the spreading of the fire. The plaintiff brings this action to recover from the railroad company the value of his building thus destroyed." Forgetting the statute 6 Ann, c. 31, § 6, and its effect upon the proposition as hereafter noticed, the court then immediately proceed to state the question to be considered, as follows: "A house in a populous city takes fire, through the negligence of the owner or his servant; the *flames extend to* and *destroy an adjacent building*. Is the owner of the first building liable to the second owner for the damage sustained by such burning?" It appears from this that the question to be decided was, as where the flames from the burning building, wrongfully fired, actually reach and necessarily and unavoidably consume another or an adjoining building, or where such other building is consumed by the mere force of the first conflagration. Next the court say: "It is a general principle that every person is liable for the consequences of his own acts. He is thus liable in damages for the proximate results of his own acts, but not for remote damages. It is not easy at all times to determine what are proximate and what are remote. In *Thomas v. Winchester* (2 Seld. 48), Judge RUGGLES defines the damages for which a party is liable, as those which are the natural and necessary consequences of his acts." Here follows an examination of some of the adjudged cases, and then these questions are put: "If, however, the fire communicates from the house of A. to that of B., and that is destroyed, is the negligent party liable for the loss? And if it spreads thence to the house of C., and thence to the house of D., and thence consecutively through the other houses, until it reaches and consumes the house of Z., is the party liable to pay the damages sustained by these twenty-four sufferers?" After this the opinion alludes to the possible difference between an intentional and a negligent firing, and to

an English decision which is directly opposed to the conclusion arrived at by the court, and proceeds thus: "Without deciding upon the importance of this distinction, I prefer to place my opinion upon the ground that, in the one case, to wit, the destruction of buildings upon which the sparks were thrown by the negligent act of the party sought to be charged, the result was to have been anticipated the moment the fire was communicated to the building—that its destruction was the ordinary and natural result of its being fired. In the second, third or twenty-fourth case as supposed, the destruction of the building was not a natural and expected result of the first firing. That a building upon which sparks and cinders fall should be destroyed or seriously injured must be expected, but that the fire should spread, and other buildings be consumed, is not a necessary or an usual result. That it is possible, *and that it is not unfrequent*, cannot be denied. The result, however, depends, not upon any necessity of a further communication of the fire, but upon a concurrence of accidental circumstances, such as the degree of heat, the state of the atmosphere, the condition and materials of the adjoining structures, and the direction of the wind. These are accidental and varying circumstances. The party has no control over them, and is not responsible for their effects. My own opinion, therefore, is, that this action cannot be sustained, for the reason that the damages incurred are not the immediate but the remote result of the negligence of the defendants. *The immediate result was the destruction of their own wood and sheds; beyond that it was remote.*"

We have thus given the facts, and all the reasoning of the court in support of the rule of law or principle attempted to be maintained by the decision. The residue of the opinion discusses some other cases upon the subject of negligence, including the leading one of *Scott v. Shepherd*, and calls attention to the dis-

astrous consequences which must ensue to all wrong-doers and parties destroying the property of others by negligence, if any other rule than that adopted by the court were to be established. The foundation upon which the argument or conclusion rests, is the assertion, broadly made, that the burning of the second building, though the *frequent*, is not the natural and expected result of the firing of the first, and the fact that the party wrongfully setting the fire cannot control the degree of the heat, the state of the atmosphere, the condition and materials of the adjoining structures, and the direction of the wind. The heat generated by the fire which he has wrongfully kindled, is not within his control, and, therefore, he is not responsible for its effects. The fire once lighted and the heat in process of generation, he cannot stay such process or prevent the effects of the heat by any means or instrumentality within his power. He did not dictate the condition of the second building, nor the materials of which it should be constructed; and if the latter are combustible, and the former such that the building must take fire and be consumed, it is the unfortunate owner's fault, not his. Neither does he dictate the state of the atmosphere, nor the direction of the wind. These are the subjects of a higher power. He cannot rebuke the winds, or bid them cease or change their course, and if they carry the fire and waft destruction on their wings, it is not his fault. He may disregard all these circumstances, and wrongfully set the fire despite them if he will, knowing their existence and the results which they will surely produce, and yet shall be regarded faultless and innocent with respect to those results.

And as to the unqualified assertion that the burning of the second house is not the natural and expected result of the firing of the first, it seems to rest upon much the same basis of reason and regard for natural and physical truth, or for the relation of causes to

their effects, as we find them constantly exhibiting themselves under the unvarying operation of universal natural laws.    In the case supposed, though the flames of the burning of the first house " extend to and destroy " the second by their own mere force, yet it is declared the destruction of the second is "not a natural and expected result of the first firing."

We have been led to this careful examination of the foregoing cases by the criticism of counsel, that our remark in the former opinion, that " the point of the decisions was that the burnings were distinct and separate. a series of events succeeding one another," and therefore, the defendants were not liable, was unjust and unfounded.   We must now leave it with the reader to say whether it was so or not.    The learned counsel having, as we are constrained to think and to say, learned their law in a wiser and better school, felt called upon to rescue those courts from the imputation of having so decided, and thus we were to be visited with the consequences of having mistaken or misunderstood their decisions, although we quoted their own words.    As already observed, we deemed it sufficient at that time to distinguish those cases from the present upon the ground on which they obviously proceeded, and, although our views then were the same as now with regard to the correctness of the decisions, we thought it unnecessary to express them.    Now, however, we have felt compelled to, and have freely done so; for it will appear from what has been said, that we do not at all accede to their correctness, notwithstanding the great consideration and respect so justly due to the judgments of the learned and able tribunals by which they were pronounced.    And in these views we are happy to say, although he differed from Justice COLE and myself in other particulars, that our late learned and lamented associate, Mr. Justice PAINE, now deceased, fully concurred.    It will be observed that the cases are not referred to or relied

upon in his opinion, and are inconsistent with it; and we know, as he frequently said, that he considered them illogical and unsound in making the order of events the criterion of liability, and in considering every result remote, except that first or immediately produced by the application of the fire. We accept now, therefore, as we did then, and regard as just and well founded, the remark of the present learned chief justice of Massachusetts, when he said of the *Ryan case:* " Nor does the opinion draw any line of distinction between what is proximate and what is remote; and such a line is not obvious in that case." And the same observation is equally and more just and true of the opinion in the case of *Kerr*. With all due respect, we must say it seems to us that the distinction, as well settled both on reason and authority, is utterly confounded and lost sight of in both. It has been often truly said, that hard cases make bad precedents; and we cannot but think that the supposed hardship of holding the negligent party responsible for all the legitimate consequences of his act must have had its influence upon the mind of the court in each case. If a servant, driving his master's carriage in the street, negligently runs over and tramples a foot passenger, making him a cripple for life, the master must respond for the damages, be they never so much. If, by the same negligent act, the servant runs over, tramples and cripples two, three, twelve or twenty-four, must the master not in like manner respond in damages for the injuries sustained by each one of them? Will it make any difference that the servant crippled A. first, then B., then C., and so on down to Z., if the crippling, of all was the natural and necessary result of the same wrongful act? And will it make any difference also in such case, that the master may be overwhelmed in damages or involved in pecuniary ruin? It is quite immaterial to the last or any intermediate sufferer, whether he be the last, first or any other in the

order to receive injury; and it would seem a most inexplicable rule of law that should found a distinction upon this circumstance, and hold, because he was the last or any one after the first, he could not recover. Some one must suffer for injuries thus inflicted; and, as between the master and innocent third persons, the law has wisely fixed that, so far as pecuniary compensation will go, it shall be the master who employs, controls and directs the servant.

Speaking of the liability of the master for damage done by the servant while actually employed in the master's service, Blackstone says: " Upon this principle, by the common law, if a servant kept his master's fire negligently, so that his neighbor's house was burned down thereby, an action lay against the master; because his negligence happened in his service." 1 Bl. Comm. 431. But this rule was changed by statute 6 Ann, c. 31, § 6, still in force, which ordains that no action shall be maintained against any in whose house or chamber any fire shall accidentally begin; for their own loss is sufficient punishment for their own or their servant's carelessness. Ibid. That statute being in force in this country at the time of the revolution and since as part of our common law, sufficiently explains the absence of precedents for the recovery of damages in such cases; but, as it does not extend to any others, they are still governed by the rule of the common law, unless expressly excepted by subsequent statutory enactment. See 1 Cooley's Bl. Comm. 431, note (19); *Bachelder v. Heagan,* 18 Me. 33; *Lansing v. Stone,* 37 Barb. 15; *Coburn v. Harvey,* 18 Wis. 147.

And if, in a case like that above supposed, the servant negligently drives against and throws down one, and he in falling strikes against and throws down another, and that one a third, and so on, until twenty-four are prostrated, trampled and injured, is the case any different, although all after the first might have escaped, but for the impulse wrongfully given to the

first, which communicated itself through him to the second, and through the second to the third, and thus on to the last? The horses and carriage wrongfully driven against and prostrating the first, and passing thence on over, trampling and bruising all to the last, are the same means or instrument of injury first negligently set in motion. And so the fire first wrongfully applied to the house of A. is the same devouring element until it reaches and consumes the house of Z. Though fed on different substances, it is throughout its march of destruction the same means or instrument of injury first wrongfully set in motion. It may, with strict propriety of speech and of reason too, be said, that the fire which consumes the last house is the very same which was unlawfully applied to the first; and that it was applied to the last by the same unlawful act.

And if we consult the analogies of the criminal law, where it is obvious that the rule of the civil law should proceed as far and even go beyond it, we shall find the same principle prevails. " If A. have a malicious intent to burn the house of B., and in setting fire to it burn the house of C. also, or if the house of B. escapes by some accident, and the fire take in the house of C. and burn it, this shall be said in law to be malicious and wilful burning of the house of C., though A. did not intend to burn that house. And accordingly it has been said, that if one man command another to burn the house of J. S., and he do so, *and the fire thereof burn another house*, the commander is accessory to the burning of such other house. So it has been held that if a person set fire to a stack, *the fire from which is* LIKELY *to communicate to a barn, and it does so*, he is, in point of law, indictable for setting fire to the barn." 2 Russell on Crimes, 549. By parity of reasoning, if one negligently set fire to the house of A., or to his own house, the fire from which is *likely* to communicate to the house of B., and it does do so, he should, in point of law, be liable for setting fire to the last house,

We remark, in passing, what has very recently fallen under our observation, that the supreme court of New York for the fourth judicial district, at general term, January, 1871, Judge JOHNSON delivering the opinion, in *Webb v. The Rome, Watertown and Ogdensburgh Railroad Co.*, 3 Lansing, 453, took the same view of the case of *Field v. New York Central Railroad* (32 N. Y. 339), which was taken by ourselves in the former opinion, and in the case before them, which was like it and like the present, followed that decision. The court observe that the case was cited in the opinion in the *Ryan case* and not overruled, and think the question should again be presented to the court of appeals. They also observe: "It is difficult to see, it must be admitted, how both decisions can stand, or if a distinction can be found, on what substantial ground of principle it can be placed." We concur in this observation, and also the following: "The question is also one of vast importance at this time, when an element so dangerous if carefully handled and used, is carried with such frequency and speed through the length and breadth of the land by a power itself generates in its passage, and under no control, except that of the parties for whose immediate benefit it is thus carried and used, or their servants. The principle is equally important to those who so use the element as a motive power, and to those who are liable to be injured by its escape along the path of its transit."

We also remark that it is said in the opinion in the case of *Kerr*, that in *Smith v. The London and Southwestern Railway Co.*, L. R. 5 C. P. 98, the question whether the damages there recovered were proximate or remote, or whether the defendant was guilty of negligence with respect to the property of the plaintiff which was destroyed, was passed over *sub silentio*. We cannot so regard the case. On the contrary, we think that was the very point under discussion, and

upon which the court divided.   The facts of the case were, that workmen, employed by the company in cutting the grass and trimming the hedges bordering on the railway, placed the trimmings in heaps near the line, and allowed them to remain there fourteen days, during very hot weather in the month of August. Fire from a passing engine ignited one of these heaps and burned the hedge, and was thence carried by a high wind across a stubble-field and a public road, and burned the goods of the plaintiff in a cottage about 200 yards distant from the railway.   It was held by BOVILL, C. J., and KEATING, J. (BRETT, J., dissenting), that there was evidence to go to the jury of negligence on the part of the railway company, although there was no suggestion that the engine was improperly constructed or driven.   BRETT, J., states the point of his dissent as follows: " But I am of opinion that no reasonable man could have foreseen that the fire would consume the hedge and pass across a stubble-field, and so get to the plaintiff's cottage at the distance of 200 yards from the railway, crossing a road in its passage. It seems to me that no duty was cast upon the defendants, *in relation to the plaintiff's property*, because it was not shown that that property was of such a nature and so situate that the defendants ought to have known that by permitting the rummage and hedge trimmings to remain on the banks of the railway, they placed it under undue peril. * * * * We read of such fires in the American prairies; but it would never occur, as it seems to me, to the mind of the most prudent person, that such an extraordinary conflagration could be caused in this country in the manner here spoken to by the witnesses."   And KEATING, J., after recounting the facts, said: " I therefore think it may be fairly inferred that the fire broke out under circumstances which showed that the materials it fell upon were in a highly combustible state.   The fire extended up the bank of the railway, through the

hedge, and across a stubble-field, and so to the plaintiff's cottage. Undoubtedly at that time there seems to have been a very high wind: and that would give a force to the fire which under ordinary circumstances it would not have had. But that which presses upon my mind is, that it is impossible to say, that the accumulation of such materials at such a season of the year, and permitting them to remain there so long, was not some evidence of negligence. It was proved that the weather was unusually dry, and that fires were occurring all about the country, though it was not expressly stated that these were on the line. Under these circumstances, I cannot help thinking that the allowing the accumulation of such materials so near to where trains were constantly passing, was evidence of negligence." And BOVILL, C. J., said: "We must therefore look at all the circumstances occurring at the time of the accident, to see if there was anything upon which to found the charge of negligence. At the time this fire occurred, the weather was and had been for a considerable period unusually dry. The company's servants had been employed in cutting the grass and trimming the hedges at the sides of the line, and had heaped together the cuttings either for the purpose of burning or carrying them away, and had allowed them to remain in that state for about a fortnight. Under ordinary circumstances, it may be that hedges are not expected to ignite; but, if there be collections of grass and hedge trimmings near them in a very dry and inflammable condition, and these by some means become ignited, it may fairly be presumed that the hedges will be in danger; and who is to say where the danger will stop? It is said that no reasonable man could have supposed that, even if the fire did communicate to the hedge, it would run across a stubble-field and a public road, and so reach a building at the distance of 200 yards from the railway. But seeing that the defendants were using dangerous

machines; that they allowed the cuttings and trimmings to remain on the banks of their railway, in a season of unusual heat and dryness, and for a time which, under these circumstances, may fairly be called unreasonable, and that there was evidence from which it might reasonably be presumed that their engines caused the ignition of these combustible materials, and that the fire did in fact extend to the cottage, I think it impossible to say that there was not evidence from which a jury might be justified in concluding there was negligence *as regards the plaintiff*, and that the destruction of the cottage in which the plaintiff's goods were was the *natural consequence of their negligence*. What the defendant's servants ought, as reasonable men, to have contemplated as the result of leaving the accumulations of cuttings and trimmings where and as they did, must depend upon all the circumstances."

Rejecting, as we are compelled to, therefore, the authority of the New York and Pennsylvania decisions, we accept that of the remaining cases cited by counsel, and also the authority of the learned counsel themselves. We entirely agree with the learned counsel when they say, speaking of the New York and Pennsylvania decisions as interpreted by ourselves: "With all due respect, we submit that this is not the true rule for determining as to the application of the maxim. * * * That it is not the true rule is demonstrated by the indisputable fact that compensation may be recovered for any number of injurious results, consecutively produced by impulsion, one upon another, and constituting distinct and separate events; provided they all necessarily follow the negligence or wrongful act constituting the first cause. * * * * * This is the distinguishing feature, upon which the damages have been held sufficiently proximate in many cases where, at first glance, they appear quite remote." This we regard as an undoubtedly correct statement of the law,

and one which is upheld by all the authorities save the two cases last referred to, which, as it seems to us, are in direct opposition to all others. This statement was made on the authority of the two cases of *McDonald v. Snelling*, 14 Allen, 290, and *Barron v. Eldredge*, 100 Mass. 455, cited by counsel. The law upon the subject is laid down with great accuracy and precision in the former and numerous cases referred to. The court say: "Where a duty or right is created wholly by contract, it can only be enforced between the contracting parties. But where the defendant has violated a duty imposed upon him by the common law, it seems just and reasonable that he should be held liable to every person injured, whose injury is the natural and probable consequence of the misconduct. In our opinion, this is the well established and ancient doctrine of the common law, and such a liability extends to consequential injuries, by whomsoever sustained, so long as they are of a character likely to follow, and which might reasonably have been anticipated as the natural and probable result under ordinary circumstances of the wrongful act. The damage is too remote if, according to the usual experience of mankind, the result was not to be expected. This is not an impracticable or unlimited sphere of accountability, extending indefinitely to all possible contingent consequences. An action can be maintained only where there is shown to be, first, a misfeasance or negligence in some particular as to which there was a duty towards the party injured, or the community generally; and, secondly, where it is apparent that the harm to the person or property of another, which has actually ensued, was reasonably likely to ensue from the act or omission complained of." And again: "It is clear from numerous authorities, that the mere circumstance that there have intervened, between the wrongful cause and the injurious consequence, acts produced by the volition of animals or of human beings, does not necessarily make

the result so remote that no action can be maintained. The test is to be found, not in the number of intervening events or agents, but in their character, and in the natural and probable connection between the wrong done and the injurious consequence. So long as it affirmatively appears that the mischief is attributable to the negligence as a result which might reasonably have been seen as probable, the liability continues."

The facts in that case were, that by the careless driving of his servant, the defendant's sled was caused to strike against the sleigh of one Baker, with such violence as to break it in pieces, throwing Baker out, frightening his horse, and causing the animal to escape from the control of its driver, and to run violently along Tremont street, round a corner, near by, into Eliot street, where he ran over the plaintiff and his sleigh, breaking that in pieces and dashing him to the ground. The court say : " Upon this statement, indisputably the defendant would be liable for the injuries received by Baker and his horse and sleigh. Why is he not responsible for the mischief done by Baker's horse in his flight ? If he had struck that animal with a whip, and so made it run away, would he not be liable for an injury like the present ? By the fault and direct agency of his servant, the defendant started the horse in uncontrollable flight through the streets. As a natural consequence, it was obviously probable that the animal might run over and injure persons traveling in the vicinity. Every one can plainly see that the accident to the plaintiff was one very likely to ensue from the careless act. We are not, therefore, dealing with remote or unexpected consequences, not easily foreseen nor ordinarily likely to occur, and the plaintiff's case falls clearly within the rule already stated as to the liability of one guilty of negligence for the consequential damages resulting therefrom."

And the court proceed to say, that the views thus expressed are fortified by numerous decisions, to a few

of which it may be expedient to refer. And they refer to the case of *Barnes v. Chapin,* 4 Allen, 444, where it was held that when a horse was turned loose on the highway, and there kicked a colt running by the side of its dam, the owner of the horse was liable for that damage. And also to *Powell v. Deveney,* 3 Cush. 300, where the defendant's servant left a truck standing beside a sidewalk in a public street, with the shafts shored up by a plank in the usual way. Another truckman temporarily left his loaded truck directly opposite on the other side of the street, after which a third truckman tried to drive his truck between the two others. In attempting to do so with due care, he hit the defendant's truck in such a manner as to whirl its shafts around on the sidewalk so that they struck the plaintiff, who was walking by, and broke her leg. For this injury she was allowed to maintain her action, the only fault imputable to the defendant being the careless position in which the truck was left by his servant on the street, which was treated as the sole cause of the breaking of the plaintiff's leg, and in legal contemplation sufficiently proximate to render the defendant responsible. These are followed by several other citations.

Now it seems needless, after what has been said, to point out the inconsistency between the two decisions of which we have been speaking and the principles thus laid down, and the cases in which they have been applied, which are to be found in all the books. The conflict is manifest; and it is equally manifest, if those two decisions are to be regarded as correct in principle and good law, that hundreds, and it might perhaps with truth be affirmed, thousands of cases, both in England and this country, are unsound and must be overruled. We cannot so regard them. We cannot agree with the court of appeals that the burning of the second and other houses in the case supposed, or of the plaintiff's house in the case before the court, was not

the *natural* and probable consequence, or the consequence *likely* to follow from the wrongful act complained of, under ordinary circumstances. It will be observed that the rule as we find it laid down, and as we believe it to be, is *not* that the injury sustained *must* be the *necessary* or unavoidable result of the wrongful act, but that it shall be the *natural and probable* consequence of it, or one likely to ensue from it. We have endeavored to show in the case supposed, and in that before the court, that it was the necessary or almost unavoidable result. The court admit that it is not *unfrequent.* By this we understand,—often to be met with—often repeated or occurring—not a particular accident, but one of the habitual incidents of setting fire to one of several houses or buildings so situated. Is it not then a natural and probable consequence, one likely to follow from the burning of the first? And may not such result be reasonably anticipated or expected according to the usual experience of mankind? If the running over a person in the street by a frightened horse which has escaped from the control of its driver, is, according to common experience, a result reasonably to be expected from the breaking away and flight of the horse, or if breaking the leg of a pedestrian by the shafts of a truck which are improperly shored up in the street, and which truck is hit by the truck of a third person, causing the shafts to whirl round and strike the leg, be a result reasonably to be expected from such improper shoring, then much more should we say that the burning of the second, third and other houses in the case supposed, was a result reasonably to have been expected from the firing of the first. A slight knowledge of the nature, laws and force of fire would seem to demonstrate this.

And the position of the court of Pennsylvania, by the rule laid down as to what is a proximate and what a remote cause, and which cuts off all liability and all remedy for consequential injuries of every

name and nature in actions for torts and wrongs, seems to us still more objectionable. Upon the doctrine of that court, the escape of the horse caused by the careless driving of the defendant's servant, had in point of law no connection with the injury subsequently inflicted upon the plaintiff. It was the remote cause. It was the running of the horse after its escape from the driver's control, which occasioned the injury, and that was the proximate cause, not produced by the carelessness of the servant and not rendering his master responsible. And so, too, in the case of the broken leg, it was the driving by the third truckman against the truck, even though he used due care, which caused the injury, unless the court would go still farther and consider the hitting of the truck one event and the whirling of the shafts another. And the strange misapplication of the maxim and of the case supposed by Professor Parsons, quoted at the outset of the opinion, of a debtor who fails to meet his engagement with his creditor, by reason of which the creditor fails to meet his, and is thrown into bankruptcy and ruined, is well illustrated by two cases cited and the comments upon them in the opinion above referred to, of the supreme court of Massachusetts. The court say: " Two recent cases, both much considered, sound and consistent with each other, well illustrate the true rule of law. A druggist who carelessly labelled belladonna, a deadly poison, as extract of dandelion, a harmless medicine, and sent it so labelled into the market, was held, by the court of appeals of New York, liable in damages, after it had passed through several intervening hands, had been purchased by an apothecary, and administered by the plaintiff to his wife, who was injured by using it as a medicine in consequence of the false label. *Thomas v. Winchester*, 2 Selden, 397. Here the dealer owed to the public a duty not to expose human life to danger by falsely labelling a noxious drug and

selling it in the market as a harmless article. To do so was culpable and actionable negligence towards all likely to be and who in fact were injured by the mistake. And the injury that did follow was the naturally and easily foreseen result of the carelessness.

" On the other hand, where one article, black oxide of manganese, in itself harmless, which became dangerous only by being combined with another, was sold by mistake, the plaintiff who purchased it of a third party and mixed it with another substance, the combination with which caused a dangerous explosion, was held by this court to have no right of action against the original vendor who made the mistake, for the damages caused by the explosion. *Davidson v. Nichols*, 11 Allen, 514. The mistake in regard to an article in its own nature ordinarily harmless, in the absence of contract or false representation, was not a violation of any public duty, or negligence of such a wrongful and illegal character as to render the party who made it liable for its consequences to third persons. Nor was it a natural and probable consequence of such a mistake that this ordinarily innocuous substance would be mixed with another chemical agent, become explosive by the combination, and a third party be thereby injured."

The case of a debtor who fails to meet his engagement is not one of tort or wrong in any legal sense. The bankruptcy and ruin of the creditor by reason of such failure is not a result likely to ensue, a natural and probable one, from the fact of such failure. Ordinarily it produces no such result, and is not, therefore, reasonably to be expected by the debtor. In rare and exceptional cases it may do so, but then only by connection or alliance with other circumstances not necessarily known to the debtor and of which he is in general ignorant and without the means of knowledge. The embarrassment of the creditor,

the extent of his engagements, his inability to meet them, and all other circumstances which produce his bankruptcy and ruin, are facts usually known only to himself, and with reference to which no general engagement of the debtor to pay at a particular time can be presumed to have been made.    And the decision in *Insurance Company v. Tweed*, 7 Wall. (U. S.) 45, referred to by the same court, also very clearly sustains our views.    Discussing the doctrine of proximate and remote causes as it has arisen and been decided by the courts in a great variety of cases, the opinion says: " One of the most reliable of the *criteria* furnished us by these authorities, is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause.    If a new force or power has intervened, *of itself sufficient* to stand as the cause of the misfortune, the other must be considered as too remote.

" In the present case we think there is no such new cause.    The explosion undoubtedly produced or set in operation the fire which burned the plaintiff's cotton. *The fact that it was carried to the cotton by first burning another building, supplies no new force or power which caused the burning.    Nor can the accidental circumstance that the wind was blowing in a direction to favor the progress of fire towards the warehouse, be considered as a new cause.*    That may have been the usual course of the breeze in that neighborhood."

Another position taken by the learned counsel is, that the dryness of the weather and the blowing of the wind at the time of the fire was set, were not *ordinary* but *extraordinary* circumstances, within the meaning of the rule above stated.    That which is frequent or oft repeated, occurring year by year with almost unvarying regularity, like periods of drouth at certain times and seasons, or like the almost daily blowing of the winds in our country, cannot be regarded as extraordinary.    These are ordinary cir-

cumstances in the completest sense of the word, and just such as persons engaged in a dangerous business the mischiefs of which may be thereby enhanced, are bound by the rule to foresee, and by increased care and vigilance to guard against.

Another and the last position of counsel which we notice, is, that it was error in the court not to have instructed the jury that they must find negligence on the part of the defendant *with respect to the property destroyed.* The question was not so put to the jury, but by a general instruction that they must find that the negligence of the defendant produced the loss and injury for which a recovery was sought. The question whether there was negligence in relation to the property destroyed, is undoubtedly one of fact for the jury, unless there is a total want of evidence tending to sustain that conclusion. It appears, however, from what has already been said, that in our judgment there was abundance of such evidence from which the jury must have so found the fact, had the point been thus submitted to them. Granting, therefore, that the instructions were defective in this particular, it would still seem to follow that the judgment ought not to be reversed. It is a settled rule that this court will not reverse for errors in the instructions or rulings of the court below, where it is clear that the verdict and judgment could not have been different on the evidence. *Andrea v. Thatcher,* 24 Wis. 471; *Ketchum v. Zeilsdorff, post,* p.  . But there is another rule of practice, also well settled, which would forbid such reversal. The general charge of the court, or instructions given, were clearly correct, embracing all the points necessary for the full understanding of the jury, except this particular one. In such case the rule is, that if a party desires to have the jury instructed upon a particular point, not embraced in the charge given by the court, or if an instruction or conclusion of law merely requires modification in some pariculart or par-

ticulars, not materially affecting its general correctness, an exception thereto should be particular, so as to call the attention of the court to the precise point of objection. *Browers v. Merrill,* 3 Chand. 46; *Lachner v. Salomon,* 9 Wis. 129; *Knox v. Webster,* 18 Wis. 406; *Weisenberg v. The City of Appleton, ante,* p. 56; *Northwestern Iron Co. v. Ætna Insurance Co., ante,* p. 78. In this case there was only a general exception, which was insufficient. Had the attention of the court been called to the point now urged, the instructions would unquestionably have been so modified. It is a fact appearing from the argument of the case in this court, that the point is raised for the first time upon this application and argument for a rehearing.

The rehearing must be denied.

*By the Court.*—Rehearing denied.