# CASES DETERMINED

# January Term, 1914.

---

BRUNNER, Respondent, vs. MINNEAPOLIS, ST. PAUL & SAULT
STE. MARIE RAILWAY COMPANY and another, Appel-
lants.

*September 19, 1913—January 13, 1914.*

*Railroads: Negligence: Fire on right of way: Burning of property:
Contributory negligence: Reasonable anticipation: Degree of
care required.*

1. One who knows that his property is exposed to destruction by
an existing fire is bound to use all reasonable precautions to
prevent its destruction, and if he fails to perform that duty is
guilty of contributory negligence precluding a recovery against
the person through whose negligence the fire started.
2. A fire which, through defendants' negligence, started on the
railroad right of way, destroyed, more than fifty hours later,
certain forest products owned by plaintiff which were piled
on the opposite side of the track. The jury found that de-
fendants ought reasonably to have anticipated, under all the
circumstances, that the fire might probably reach and burn
plaintiff's forest products as a natural and probable result.
Upon evidence showing, among other things, that plaintiff,
who lived only eighty rods from the track, was on the ground
with one or two of his employees when the fire started; that
they were there during the usual working hours most of the
time until the fire reached his wood; that he knew everything
about the facts and surrounding conditions that defendants'
agents could or ought to have known; that he knew of the
progress of the fire and that defendants had not sent any one
to put it out; and that he had no reason for thinking that any
of their agents in authority knew of it or intended to put it
out if they did, it is *held* that he also ought reasonably to have
anticipated that the fire might probably reach and burn his
wood.

3. Upon the facts established by plaintiff's own evidence, and in view of the existing conditions known to him, it is *held*, contrary to a finding by the jury, that plaintiff did not use that degree of care and caution to prevent the destruction of his property that the law required him to exercise, and hence that he was guilty of contributory negligence precluding a recovery. KERWIN and SIEBECKER, JJ., dissent.

APPEAL from a judgment of the circuit court for Marathon county: A. H. REID, Circuit Judge. *Reversed.*

This action was brought to recover damages for the burning of certain forest products piled for shipment by the plaintiff along and adjacent to a spur track of the Abbotsford & North Eastern Railway Company. It was alleged in the complaint that the defendant railway company owned and operated the railroad and spur track, and that its codefendant by its permission operated the locomotive which set the fire. The acts of negligence claimed were (1) failure to properly equip the locomotive so as to prevent the escape of sparks; (2) want of ordinary care in the operation of the locomotive; (3) failure to keep the right of way free from combustible material. The jury found all three acts of negligence and acquitted the plaintiff of contributory negligence. It also found in answer to the first question of the special verdict that the fire which eventually destroyed plaintiff's property was set on the right of way by an engine operated by the *Copper River Land Company* on the forenoon of May 4, 1911. The sixth question of the special verdict was as follows:

"(6) If you answer the first question 'Yes,' then ought the defendants to have reasonably anticipated, under all the circumstances, that said fire might probably reach and burn plaintiff's forest products as a natural and probable result? *A.* Yes."

The court rendered judgment in favor of the plaintiff for the value of the material destroyed as found by the jury, and the defendants appeal from the judgment.

*W. A. Hayes,* for the appellant *Minneapolis, St. Paul & Sault Ste. Marie Railway Company.*

For the appellant *Copper River Land Company* there were briefs by *Lines, Spooner, Ellis & Quarles,* and oral argument by *George Lines.*

*Emery W. Crosby,* attorney, and *R. J. MacBride,* of counsel, for the respondent.

The following opinion was filed October 7, 1913:

BARNES, J.  The appellants insist that the judgment is erroneous and should be reversed on the following grounds: (1) There was no evidence showing or tending to show that the defendant railway company either owned or operated the railroad or spur track in question; (2) the plaintiff assumed the hazard which caused the destruction of his property; (3) the plaintiff was a trespasser or at best a mere licensee, toward whom the defendants owed no duty except to refrain from acts wilfully injurious; and (4) the plaintiff was guilty of contributory negligence.

The conclusion reached on the question of contributory negligence obviates the necessity of considering any of the other assignments of error.

The property destroyed consisted of hemlock and basswood bolts and kiln wood. The amount found by the jury was 1,400 cords. About 300 cords of the kiln wood had been piled along the spur track for more than a year before the fire. This wood was fuzzy and rotten and extremely dry and inflammable, as much so as tobacco or cotton, according to plaintiff's evidence. The rest of the wood had been hauled during the winter preceding the fire. The fire that destroyed the wood was set by a passing locomotive between 10 and 11 o'clock on the forenoon of May 4, 1911. The weather was and had been dry for some time before the fire. The plaintiff owned the northeast quarter of section 34, township number 29 north, of range 2 east, in Marathon county. The railroad ran through this land in a northeasterly and

southwesterly direction. The spur track in question was on the southwest quarter of the northeast quarter of the aforesaid section and on the northerly side of the main track. The fire caught on the right of way on the southerly side of the track and opposite where the wood was piled. There was no wood piled on the south side. The plaintiff and one of his employees were at work four or five hundred feet from where the wood was piled when the engine passed which the jury found set the fire, and they discovered the fire almost immediately after the train passed. The plaintiff's land on the south side of the track was cut over and there was considerable *débris* thereon, and the railroad right of way was also badly littered with the *débris* usually found after forest products have been removed and the land has not been cleared up. There was a moderately brisk northwesterly wind on the day on which the fire was set, as well as on the day following. The wind went down toward evening on the 4th and 5th of May. On May 6th the wind changed and blew more strongly than on the preceding days and from the southwest and drove the fire across the track and into the plaintiff's wood.

The undisputed evidence tends to establish some facts which it is difficult for any one who has ever seen a forest fire, or for any one who hasn't for that matter, to understand and harmonize. It is undisputed that it had been very dry for some time before the fire; that there was a brisk wind blowing; that there were old logs, stumps, tree tops, small balsam trees, and grass and weeds in abundance in the path of the fire, and yet on the day it started it only burned over a strip about 100 feet wide and from 100 to 200 feet long. On the second day the area burned over was no greater, and on the third day the fire spread over a somewhat larger territory. The fire spread very little during either night. It is a fair conclusion to draw from the evidence that during the first forty-five hours that elapsed after the fire started,

it did not run over to exceed what would be one half of an ordinary sized block in a city or village.

The jury found that the defendants ought reasonably to have anticipated under all the circumstances that the fire set might probably reach and burn the plaintiff's forest products as a natural and probable result. If the defendants were bound to anticipate the burning of plaintiff's property, then assuredly the plaintiff was bound to anticipate that it would be burned as a natural and probable result of the fire. The plaintiff's conduct after he discovered the fire must be judged in the light of the anticipation that the fire would probably reach and destroy his property. He lived only eighty rods from the spur track. He had been working around there on and off for a couple of years, and knew the condition of the right of way as well as of his own land adjacent thereto. He was practically on the ground when the fire started, working with one of his employees. He testified that immediately after the train passed he saw the blaze that set the fire. Another of his employees was on the ground in the afternoon, but apparently took no very active part in putting out the fire; at least he carried no water. Plaintiff knew of its progress during the fifty-odd hours that elapsed between the time it started and the time it reached his wood. As owner of the property exposed to destruction and knowing of the existence of the fire, he was bound to use all reasonable precautions to prevent its destruction, and if he failed to perform the duty which the law enjoined on him in this regard, he was guilty of contributory negligence, which in law precludes a recovery. *Kellogg v. C. & N. W. R. Co.* 26 Wis. 223; *Mills v. C., M. & St. P. R. Co.* 76 Wis. 422, 45 N. W. 225; *Austin v. C., M. & St. P. R. Co.* 93 Wis. 496, 67 N. W. 1129; *Gibbons v. Wis. Valley R. Co.* 62 Wis. 546, 22 N. W. 533.

Does the undisputed evidence show that the plaintiff was guilty of contributory negligence? There is in fact no dis-

pute in the evidence upon the question. It was given by the plaintiff and his brother-in-law. The circuit judge, in his opinion on the motion for judgment by defendants after verdict, said that he had grave doubt on this question, but concluded that negligence on plaintiff's part was not so clearly established that reasonable minds might not differ on the subject.

It might be here remarked that if this fire had been set in the plaintiff's wood without any other act of negligence on the part of the railway company than that of allowing the material to remain on its right of way the length of time which it did, and the fire communicated to the property of a third person, the defendant railway company would be liable for the resulting damages under the doctrine of *Theresa Village Mut. F. Ins. Co. v. Wis. Cent. R. Co.* 144 Wis. 321, 128 N. W. 103. The case under consideration presents a more aggravated situation than did the *Theresa Case.* The right of way and land adjacent thereto contained a lot of combustible material. The wood was of the same character in a large part, and it was permitted to remain on the right of way nearly a year longer. The amount of material stored was considerably larger. If it would be negligence for the railway company to permit the wood to remain, it would certainly be negligence for the owner to do so. It was the duty of the plaintiff, under the decision cited, to have shipped his wood before the fire. Had he done so, it would not have burned. But, assuming that this act of negligence would not be a defense against negligence on the part of the defendants, we think the evidence failed to show that the plaintiff used reasonable diligence to put out a fire that he had reason to anticipate would probably destroy his property if not brought under control.

In the first place, it seems well nigh incredible that a woods fire which was only able to cover a space 100 feet wide by 100 to 200 feet in length from before 11 o'clock in the

morning until 6 o'clock in the evening of May 4th, occurring during a dry time and fanned by a wind, could not, with a reasonable endeavor on the part of the plaintiff and his employees, have been prevented from spreading further. What is true of May 4th is just as true of May 5th and the early part of May 6th.

In the next place, when plaintiff found he could not control the fire, if he did so find, he neither notified the railway company nor his neighbors, nor called for any assistance from his neighbors until the fire reached his wood on May 6th. Then in less than half an hour he got fifteen or twenty of them to come to his assistance and they succeeded in saving a part of the wood. He had a number of neighbors living near him with whom he had telephone connections, and he could also reach the agent of the railway company at Abbotsford, four miles distant, in the same manner. It was the custom of the railway company to send men to put out fires that were running along its right of way, when notified of their existence. Although he permitted a lot of highly inflammable material to remain on the badly littered up right of way for considerably more than a year, he never even took the precaution to keep a few barrels of water on the premises that would be handy for use in an emergency. He abandoned the fire entirely on the night of May 4th and also on the night following. The wind was down on both nights and the fire spread very little. It at least seems incredible that the fire could not be put out on either night in the little patch where it was working, had any reasonable effort been used. It is hardly ordinary care for a man to sit down after 6 o'clock and do nothing to prevent a fire from destroying his property, unless some reasonable excuse is offered for so doing. With the assistance of his men, it is obvious that this fire could have been put out or its spread prevented on either night. If his men refused to work, and his brother-in-law hardly would have done so, he might call

upon his neighbors, but he did not even work himself.     The Big Eau Plaine river was within twenty or thirty rods of the wood yard, and there was also a spring not to exceed twenty or thirty rods away.     There was not a shovelful of dirt thrown on the fire and no attempt made to throw up any embankment or dig any trench around it, although the testi-mony of the plaintiff showed that the shovel was an imple-ment commonly used to fight forest fires by throwing up dirt and stamping out the fire.     What the plaintiff and his men did do was to carry some water from the spring for an hour or two on the first day and to brush away some leaves from the path of the fire on this and the succeeding days.     But even this latter work they did not keep up.     Part of the time they spend in simply watching the fire and part of the time in peeling the bark from the basswood bolts and doing other work around the wood piles that had no connection with the fire whatever.

Concerning his efforts to put out the fire on May 4th, the plaintiff, among other things, testified that he noticed it as soon as the train had gone by; that he was about 400 or 500 feet from the track; Frank Davis was with him; that they rushed down and saw it was burning pretty good and that he rushed up to his house and got some pails and they carried water from the spring and tried to put it out and couldn't; that he did not know how many pails of water they used on it.     They brought water there quite a while until the fire ran away from them to the south.     It might be here re-marked that the utmost extent to which the fire ran on May 4th did not exceed 200 feet in length by 100 feet in width.     He further testified:

"Q. Did you try to put it out with anything else besides pails of water?     A. No.     Q. What else did you do that day to try to put it out?     A. We didn't do much of anything. We tried to put it out with water and we couldn't do it. Q. How long did you keep up your efforts to put it out with water?     A. We worked about an hour or two.     Q. After that

what did you do? A. Well, we kind of kept watch of it. Tried to keep it from running further if we could. Q. What did you do to keep it from running? A. We kind of scratched the leaves away. Tried to make a track so that it could not get across. Q. Across what? A. Across the leaves. Q. How far did the fire go that day? A. It must have went a couple of hundred feet, something like that. Q. Toward the south? A. Yes, and it spread some too. Q. How wide did it spread? A. Might have spread a hundred feet. Q. What was there on this ground that the fire went over that day? A. There was brush and old logs— grass."

Continuing, the witness said:

"We stayed there fighting it until about 6 o'clock. We went to dinner that day. Davis and I changed off. When it came 6 o'clock he and I left it. I went down after supper and looked at it, but Davis didn't. It was still burning after supper over this piece of land. Some places it was burning in logs and rubbish and stumps laying all over. I didn't leave anybody there to watch it that night. Jacobi was there in the afternoon. He did not bring pails of water. Didn't do anything after about 6 o'clock."

Referring to the efforts made to put out or control the fire on the following day, the plaintiff testified that he got there in the morning about 7 o'clock.

"Q. What did you try to do then? A. Couldn't do much of anything. Q. What did you try to do? A. Fire was all over. Hard chance to put it out. Q. What did you try to do? A. Well, we couldn't do much of anything at all. Q. Did you try to do anything? A. Sure, we tried. Q. What did you try to do? A. We tried to scratch the leaves, you know, and get a track, and tried to keep the fire from running across it, but it would get across. Q. This was still burning down toward the south, was it? A. Yes. Q. When you got there on the morning of the 5th had it spread much during the night? A. It spread some, but it didn't spread as much as it did during the day. Q. Who did you have there helping you on the 5th? A. Davis and Jacobi. Q. Did you work there all that day? A. No.

Q. How long did you work? A. We worked so long as we see we couldn't hold the fire from going any further. Q. How long was that? A. It was maybe a couple of hours—three hours—four hours. Q. You worked there two or three or four hours that day? A. Yes. Q. And then you didn't work any more? A. No, we kept watch of it so that if there was sparks flying we would keep that out. Q. How far did it burn that day? A. It must have burned a couple of hundred feet more. Q. So that would make in the neighborhood of 400 feet all together? A. Yes, three or four hundred feet."

The witness further testified that they left the fire at 6 o'clock that evening, and that he went down after supper and looked at it and that it was still burning; that there must have been a couple of hundred feet that was on fire, the way it was running. There wasn't as much flame as during the daytime. Plaintiff testified that on the morning of the 6th he got down there at 7 o'clock. The fire was not burning so hard; that it had gone down during the night; that he made an effort to put it out on the morning of the 6th.

"Q. What did you do? A. We tried to surround it the way we did the other day. Q. Who was there to help you? A. Edwin Jacobi. Q. Davis too? A. Yes, Davis was there too. Q. You say you tried to surround it. What did you do? A. We tried to scratch a track the way I told you before and scratch the leaves away and try to keep it from running across. Some time after, the wind came up and it ran right across and got away just the same. I did not notify the railroad men that the fire was burning. They had employees running by there. I thought they saw the fire. I had a telephone in our house at that time connected with Abbotsford. I knew there were officers of the railway company at Abbotsford. I did not ask anybody except Davis and Jacobi to help me fight the fire while it was burning across the track—didn't until it got into my wood."

The witness further testified that the wind was blowing from the southwest on the morning of the 6th when he got

up. Went down to the fire between 7 and 8 o'clock. Fire had sort of died down during the night. The fire was burning to the west side of the burned-over place on the 6th. Came up close to the previous burnings—way up to it all the way up to the track. The fire reached the track about 1 or 2 o'clock on the 6th. I was down there all the time. Edwin Jacobi and Frank Davis were with me right along. Of course we changed off to get our dinner. We went to dinner that day the same as other days, we changed off.

When the fire got across the track and into the wood the witness "hollered" for help and got fifteen or twenty men there in a very short time. The amount burned on the 6th was considerably more than on the 4th. The fire burned faster. Started all over on the wood, sparks flying over there, and it burned on top and on the sides and all over. Kiln wood was the nearest to the track. It was pretty dry. This light, loose, splintery, fuzzy stuff, a pretty small spark will set to going—start almost as quickly as tobacco or cotton.

Edwin Jacobi, a brother-in-law of the plaintiff, testified to substantially the same state of facts as the plaintiff. He said: We tried the best we could to put it out. I worked there all afternoon of the 4th. On the 5th I was there early in the morning. We worked there pretty near all day up to 4 o'clock; we could not check it then. On the 6th we was down there again and tried it, but could not succeed in checking it. I was there when the wood yard burned. The wind was blowing from the southwest, and the fire came around, followed the outer edge of it. And as it came near the landing it spread out. It was somewhere near 2 o'clock before the fire got into the yard on the 6th.

"Q. Didn't you also work in the wood yard in the forenoon of the 6th? A. No. Q. Peeling bolts and piling wood? A. About two or three hours of it, early in the morning before the wind arose. Q. And Davis worked some there also,

didn't he? A. Not with me. Q. But elsewhere in the yard? A. He worked a little further up around the yard, not in the yard. Q. What was he doing? A. Cleaning up also. Q. And piling also? A. Yes, sir. Davis did not do any peeling. While I worked there peeling and piling and cleaning I would look over at the fire occasionally and then peel and pile and look over at the fire again."

Witness also testified that he worked in the wood yard on and off during May 5th, but did not do any work therein on the afternoon of May 4th.

The condition, then, on the morning of May 6th was this: The wind had changed and increased and was blowing so as to carry the fire toward plaintiff's wood; the wood was dry and inflammable; the ground was dry and littered with dead tops, brush, and grass, and at the utmost the fire was not more than 400 feet away from the wood. It was not only probable but inevitable that the fire would reach the wood, unless it rained or the wind changed or there was some efficient work done to stop it. There is no claim that it looked like rain and no reason to suppose that the wind would suddenly change. Yet with this situation before him, plaintiff not only failed to call for any help, but he kept his two employees, Davis and Jacobi, at their usual work in the wood yard for at least two or three hours in the morning. It is true Jacobi says that this occurred before the wind came up, but plaintiff said the wind had shifted during the night and was blowing from the southwest in the morning when he got up, but that it got stronger during the day. We do not think there was any room for the jury to draw the inference from this testimony that the plaintiff used that degree of diligence in attempting to control this fire that an ordinarily prudent person would use who had every reason to anticipate and who in fact did anticipate that his property would in all probability be destroyed by fire unless its spread was prevented. No water was used after the first day. What work was done thereafter consisted in putting out sparks and brushing away

leaves from the path of the fire.   The fire had been driven back to the track and within a few feet of the plaintiff's wood about noon of the 6th.   The plaintiff and his employees changed off and went to dinner as usual, but the fire did not reach the wood until between 1 and 2 o'clock, and it was not until then that help was called for.   Until this fire got into the plaintiff's wood it was a diminutive affair.   This is apparent from the small area which it covered and the character of the stuff on which it fed.   It is something of a tax on one's credulity to believe that its spread could not be prevented day or night by the plaintiff and his employees, had they made an intelligent and determined effort to do so.   The attempts to stop this fire, at least after the first day, were desultory and feeble and no attempt whatever was made to secure reinforcements.   The witness DeLapp testified that plaintiff gave him as a reason for not getting help that he thought from the condition of the wind he would "let it burn and do away with the rubbish on that side of the track." Plaintiff did not deny making this statement, except to this extent: He said he did not remember of having made the statement and did not think he made it.

We hold that on the facts which are established by the evidence of the plaintiff without dispute, and in view of the existing conditions which were known to the plaintiff, he did not exercise that degree of care and caution to prevent the destruction of his property that the law required him to exercise, and that he has no right of recovery in this action.

By the Court.—The judgment of the circuit court is reversed, and the cause is remanded with directions to dismiss the complaint.

The following dissenting opinions were filed October 17, 1913:

KERWIN, J. (dissenting).   The jury found that the plaintiff was not guilty of contributory negligence, and the court

sustained that finding in a very able opinion in which he carefully considers the case, discussing all the points made by appellants and resolving them in favor of the plaintiff. This court has repeatedly held that if there is any credible evidence to support the verdict it cannot be disturbed, and that the judgment of the trial court sustaining the verdict should not be set aside unless clearly wrong. *Nolan v. Kroening,* 130 Wis. 79, 109 N. W. 963; *Hoveland v. Nat. B. Works,* 134 Wis. 342, 114 N. W. 795; *Kroger v. Cumberland F. P. Co.* 145 Wis. 433, 130 N. W. 513; *Ritter v. C., M. & St. P. R. Co.* 128 Wis. 276, 106 N. W. 1103; *Lam Yee v. State,* 132 Wis. 527, 112 N. W. 425; *Clemons v. C., St. P., M. & O. R. Co.* 137 Wis. 387, 119 N. W. 102; *Sparks v. Wis. Cent. R. Co.* 139 Wis. 108, 120 N. W. 858; *Lind v. Uniform S. & P. Co.* 140 Wis. 183, 120 N. W. 839; *Fitzpatrick v. Lake Superior T. & T. R. Co.* 142 Wis. 65, 124 N. W. 1054; *Rogers v. Brown,* 143 Wis. 472, 128 N. W. 64; *White v. M., St. P. & S. S. M. R. Co.* 147 Wis. 141, 133 N. W. 148; *Slam v. Lake Superior T. & T. R. Co.* 152 Wis. 426, 140 N. W. 30.

After a careful examination of the record I am unable to say that there is no credible evidence to support the verdict nor that the judgment of the court below is clearly wrong. I cannot agree to the proposition stated in the majority opinion to the effect that because the jury found that the defendant ought "reasonably to have anticipated under all the circumstances that said fire might probably reach and burn the plaintiff's forest products as a natural and probable result," the plaintiff was bound to anticipate that the property would be burned as a natural and probable result of the fire. I do not regard the analogy perfect. A different relation exists between plaintiff and defendant on the element of anticipation. The jury would be entitled to find reasonable anticipation on the part of defendant and not on the part of plaintiff under the circumstances of the case. The defendant was bound to keep its right of way free from combustible matter

and protect property from fires originating upon its right of way through its negligence or failure to perform its duty. In the exercise of ordinary care on his part the plaintiff had a right to presume that the defendant would perform its duty, and conduct its business accordingly. Beach, Contrib. Neg. sec. 237. The finding of anticipation by defendant for the reasons stated and others, perhaps, does not necessarily charge the plaintiff with the element of anticipation.

The main question, however, upon which the majority opinion turns is the alleged contributory negligence of the plaintiff. The learned trial judge found trouble with this question, and the fact that he did is evidence that he very carefully considered it. I think the evidence ample to warrant the jury in finding that the plaintiff was not guilty of contributory negligence. During May 4th and 5th there was little, if any, danger of the fire reaching the plaintiff's property. It started on the south side of the right of way and continued to run in a southerly direction away from plaintiff's property. The defendant's employees had knowledge of the fire, and the plaintiff had a right to believe they would assist in putting it out, if it became dangerous, without being requested. The course of the fire during the 4th and 5th was toward the river and away from the wood yard. The plaintiff and two others did considerable work during this time in trying to put it out, but failed, although doubtless they considerably retarded its progress, since it burned over a very small territory during the 4th and 5th. True, the evidence shows that plaintiff did not work fighting the fire on the nights of the 4th and 5th, but he did return after supper and kept watch of it for a time until he was satisfied that it would do no harm during the night. It is entirely probable that plaintiff could not fight a forest fire for two days and two nights in succession without rest, and his belief that it was in such condition that it could be left with safety seems to have been verified by the fact that the fire made little progress

during either night and reached no danger point. Whether a fire is sufficiently subdued so that it will smoulder and gradually die out is peculiarly a matter of judgment upon which the plaintiff could be mistaken without being negligent.

It is said in the majority opinion that the plaintiff did not work effectually, that he did not shovel dirt, but merely scratched off leaves and made tracks around the fire. Whether the work done was effectual work or the proper way to fight the fire, a jury of the county and the judge of the circuit were as well, if not better, able to judge than this court. It is quite obvious that the proper or best manner of fighting a fire may vary according to circumstances. A prairie fire could doubtless be most effectually fought by plowing around it or surrounding it by a trench. But a forest fire and a fire in a "slashing" among the tree tops, brush piles, small undergrowth of timber, a mass of roots, brush, and shrubbery, are quite different propositions, and the progress must be stayed in a different manner. It is often a proper way to fight fire with fire—a back fire. It is a common thing in fighting fire to build a fire ahead of the destructive fire, burn off the combustible matter, and thus stay the progress of the large fire. The defendant introduced some evidence to the effect that plaintiff said that he would let the fire burn and clear off the rubbish after it started on the 4th. I think the jury would be well warranted in finding that this was not negligence even if the plaintiff did so. If the defendant had cleared its right of way at the place in question on the 4th after the fire started, either by clearing off the rubbish or burning it while the wind was from the north, no injury would have been occasioned to plaintiff. The fact that the plaintiff and his helpers did not use shovels in fighting the fire was not negligence under the circumstances of the case. Conditions were such that shovels could not be used efficiently. Digging ahead of a fire in "slashings" among second growth of timber, brush,

and roots obviously would not be effectual.    Moreover, it appears from the evidence that the fire burned with considerable fury and that shoveling or digging ahead of it to the extent that could be done would be wholly unavailing.    This is evident from the fact that the fire jumped the railroad track when it reached it on the 6th and started fresh fires in the wood piles.

I think it was for the jury to say whether the manner of fighting the fire and the means used, under all the circumstances, were the exercise of ordinary care on the part of the plaintiff.    The evidence shows that plaintiff and his employees tried to put out the fire with water and could not do so; that they scratched away the leaves and made tracks around the fire.    This evidence tends to show that they tried to surround it or stay its progress by making a track cleared of all combustible material so that when it reached this track it would go no further.    Could not the jury find that it was ordinary care to fight the fire, under the circumstances, in the manner the evidence shows they did fight it?

The evidence tends to show that the fire did not make great progress on the 4th and 5th and that it was kept pretty well under control, but that plaintiff and his help could not extinguish it.    Its course was toward the river, which was not far away, at which it would spend its force.    On the morning of the 6th, however, the wind changed and drove it back toward plaintiff's property.    The plaintiff and his employees worked at it in the forenoon and tried to surround it the same as they did on the previous days, but were unable to stay its progress, whereupon they called the neighbors and collected fifteen or twenty men who appeared with pails and aided in trying to extinguish the fire, but failed.    The question is not whether it was possible to fully extinguish the fire by collecting a large force before the 6th, but whether it was ordinary care on the part of the plaintiff to fight the fire as he

did when there was no immediate danger, and when he thought the railroad employees knew of the fire and would assist in putting it out if there was danger.

Even on the morning of the 6th the fire was not dangerous. It had died out during the night of the 5th, but the wind rose during the forenoon of the 6th, got stronger during the day, and the fire reached the track about 1 or 2 o'clock p. m. of the 6th. During the nights of the 4th and 5th the evidence shows that the fire was confined largely to logs and old stumps where it had caught; it would stick in the old stumps; the other stuff had pretty well burned up, but kept burning some in the stumps. So it appears that plaintiff and his help kept the fire pretty well under control on the 4th and 5th. One witness testified respecting work on the 4th:

"Q. Did you do anything that afternoon with *Mr. Brunner* to put out this fire? A. Yes, I did. Q. Will you tell the court and jury what you did there? A. We first tried to put it out with some water and we didn't succeed very well with that, so we went to work where the largest blazes were of the fire. We scraped the leaves away to keep it from running, and then we couldn't stop it while the wind was blowing so hard and throwed the sparks over that, and all we could do was to surround it with water again and put out these little sparks that would start up that we could control. But that was to no effect, the wind was too strong. It was too strong. It was burning all over and there were tops of hemlock trees fell over, and balsams. They give a pretty good blaze, and when it got in there we could not control it. We tried the best we could to put it out. Q. Did you work there all the afternoon of the 4th? A. Yes, sir. Q. How about the 5th? A. I was there early in the morning. Q. Did you work around this fire during all the time on the 5th? A. We worked there pretty near all day up to 4 o'clock; we could not check it then."

There is evidence that the wind changed during the night or morning of the 6th and got strong during the day and that the fire turned and burned another strip about 200 feet

wide back to the track.    This strip was about 400 feet long,
so that the amount burned on the 6th was considerably more
than that burned on the 4th.    This strip burned on the 6th
was covered with combustible matter on the right of way, and
when the fire reached the right of way up to the track the
sparks flew across and caught in plaintiff's wood.    The
sparks set fire to the wood all over.    "Sparks flying over
there, and it burned on top and it burned on the sides and
all over."

The evidence not only shows that the fire started on the
right of way on the 4th and burned away from the track
the 4th and 5th, but that then the wind changed and it
burned a new track back and into the rubbish and combustible
material on the right of way, and when it burned up to the
track it threw sparks across into plaintiff's wood piles and
destroyed them.    The evidence is sufficient to warrant the
jury in finding that the defendant's employees knew of the
fire on the 4th and 5th and knew that plaintiff had a right to
believe that defendant would clear its right of way of com-
bustible material and prevent the fire from running upon
and over its right of way if it returned.    There is evidence
that the employees of defendant went over the track at the
point in question at least twice a day during the 4th, 5th,
and 6th and knew of the fire; that the right of way was cov-
ered with rubbish and other combustible material.    The
law requires the defendant to keep its track clean.    The
plaintiff had a right to presume that after the fire started on
the 4th the defendant would guard against damage which
might be occasioned by the accumulation of combustible ma-
terial on its right of way.    All of these circumstances must
be taken into account in determining whether plaintiff was
guilty of contributory negligence.    The plaintiff was not
bound to call upon defendant to perform its duty.    He with
the help he had was quite active in fighting the fire and kept

it fairly well subdued to the extent that it did not spread in any dangerous direction until the forenoon of the 6th, when a strong wind drove it again upon the right of way and into a mass of rubbish and combustible material which should not have been there.

Some of the evidence is set out in the majority opinion, but of course it is difficult to get a very accurate idea from fragments of what the whole evidence tends to prove. The evidence shows that the plaintiff's wood was piled on the north side of the track and that the fire started on the south side; part of the wood was piled on the right of way and part on the plaintiff's land; the wood was placed in this position so as to be convenient to load on cars for shipment; the fire started in a pile of rubbish on the right of way May 4th. The plaintiff testified that after the train passed on the 4th of May the fire started on the right of way and he rushed to it and saw that he could not do anything without water, so he went for a couple of pails, but before he got back the fire had spread and it was impossible to put it out; that it ran off onto his land from the right of way and burned down several hundred feet; that it was awfully dry at that time; that there was a spring twenty or thirty rods from the fire from which he carried water, but could not put it out; that the wind was blowing a good breeze; that it was awfully easy for the fire to start in the rubbish on the right of way, and when it did start it burned "awful hard right away;" that plaintiff had a man or two with him helping him fight the fire on the 4th and they worked until 6 o'clock or a little after; that the next morning the fire was still burning but not blazing so hard—the wind had gone down a little; that the fire kept burning on the 5th; that plaintiff could not put it out on the 4th or 5th, but he had his men keep watch of it and tried to keep it from running farther; that they made tracks around it so it could not get across; that at noon plaintiff and his men changed off to go to dinner

so as to leave one watching it, and plaintiff went down after supper and watched it; that the right of way extended through plaintiff's land, so that he owned land on both sides of the track.   Plaintiff produced the following evidence:

"Q. Will you explain to this jury what this pile of rubbish that you say this fire started in was? A. It was a pile of old ties and old bark and all stuff they had picked up and throwed up on a pile and then grass had growed up—high weeds,—and it was awful easy for the fire to start.   When it did start it burned awful hard right away.   It was awful dry.   Q. What condition was this right of way in right around next to your log piles as to being cleared up or whether there was any refuse or anything on there?   A. It was in bad shape.   Q. Tell the jury.   A. It was grass and weeds and small brush and old logs and ties and everything lying along the whole right of way there." . . .

"Q. You stayed there how long that afternoon—the afternoon of the 4th?   A. I stayed there until 6 o'clock or maybe a little after.   Q. And then the fire was burning how far away from your wood yard at that time?   A. It must have been from two to three hundred feet from the wood yard at that time.   Q. How was it the next morning when you came down there?   A. It was still burning.   It was not blazing so hard the next morning.   The wind had gone down a little bit, but after a little bit the wind rose a little bit.   Q. On the morning of the 5th what direction was the wind?   A. In the north yet.   Q. Did that fire keep on burning?   A. Yes, kept on burning all day the 5th.   Q. Did it burn as much on the 5th as it did on the 4th?   A. Yes, it burned more on the 5th than it did on the 4th.   Q. What happened on the morning of the 6th?   A. The wind had changed to the southwest and it kept blowing this fire back toward my land, and of course during the day the wind got pretty strong and after dinner between 1 and 2 o'clock, why it came so fast we could not keep it back and it got across the track into my wood yard and we could not put that out. Q. Who was there helping you at the time the wood yard burned?   A. There was Edwin Jacobi right there when the wood yard started to burn.   He was right there helping me fight the fire.   Of course after it got into my wood I run up

to the house and got some more pails, and I run up on the road and I hollered 'fire' as loud as I could and rushed back and some more of my neighbors came down with some more pails. But it was impossible for us to put it out, and within a short time the fire got so hot we could not do anything. All we could do was to surround it and keep it from running my whole land. Wherever the sparks would fly we would put that out. Q. You watched this fire all the day of the 5th with a man? A. Yes, I did. Q. And also the morning of the 6th? A. Yes, sir." . . .

"Q. On the 4th of May, the first day of the fire, who was with you? A. Frank Davis. Q. I mean helping to put it out. A. Yes, he was there at that time in the morning. In the afternoon Edwin Jacobi was there too." . . .

"Q. On the 5th who was there with you during the fire? A. Frank Davis and Edwin Jacobi. Q. Anybody else? A. No. Q. The 6th, the day they destroyed your wood yard, what other people were there? A. After the yard had caught fire there was quite a number of people there— the neighbors. Of course before the yard had caught fire there was me and Edwin Jacobi and this Davis. Q. That was before it crossed the railroad track from the south? A. Yes. Q. You had no wood on the south side of the track? A. No." . . .

"Q. How long did you keep up your efforts to put it out with water? A. We worked about an hour or two. Q. After that what did you do? A. Well, we kind of kept watch of it. Tried to keep it from running further if we could. Q. What did you do to keep it from running? A. We kind of scratched the leaves away. Tried to make a track so that it could not get across." . . . .

"Q. Did you make any effort to put it out on the morning of the 6th? A. Yes, sir. Q. What did you do? A. We tried to surround it the way we did the other day. Q. Who was there to help you? A. Edwin Jacobi. Q. Davis too? A. Yes, Davis was there too. Q. You say you tried to surround it. What did you do? A. We tried to scratch a track the way I told you before and scratch the leaves away and try to keep it from running across. Some time after the wind came up and it ran right across and got away just the same." . . .

"Q. About how wide a strip did it burn from the south

side of the right of way down toward the river? A. It burned maybe 100 feet or so when it went down. When it came back it burned another strip maybe the same width, maybe a little wider. Q. Did it go clear to the river? A. No, it didn't. Q. What stopped it? A. There was a kind of old clearing over in there. Old marsh near the river. Q. How long was it before it got down to that point near the river where it stopped? A. About a day and half or so. Q. And along about the evening of the 5th? A. Yes." . . .

"Q. On the morning of the 6th the fire turned around and again came back toward the track, did it? A. Yes, it did. Q. And gradually worked another strip back? A. Yes. Q. And about how wide would you say the strip was which was burned back on the forenoon of the 6th? A. It must have been maybe 200 feet wide. Q. And about how long? About 400 feet? A. Yes, something like that. Q. So that the amount burned on the 6th was considerable more than that burned on the 4th? A. Yes. Q. Burned faster? A. Yes. Q. Or was the material a little drier? A. Well, it wasn't much drier, but it was a little more old rubbish and grass, I suppose, and the wind was a good deal stronger, so it drove it through fast. Q. Did this brush, rubbish, old logs, stumps, and tree tops and the like cover all of that strip burned on the 6th? A. Yes. Q. Clear up to the right of way? A. Yes. Q. And when it got up to the right of way these sparks began to fly over from time to time? A. Yes. Of course the right of way was all the same kind of rubbish and it burned over on that. It never stopped until it got right to the track. Q. Where did the fire start on the wood? On the top or down on the ground? A. It started all over. Sparks flying over there, and it burned on top and it burned on the sides and all over."

Speaking of the fire on the 6th before it caught the wood the witness said:

"Q. When things got to that point you and Davis were still alone? A. No, Jacobi was there. Q. You and Jacobi and Davis? A. Yes, sir. Q. No other help had yet— A. No. Q. And then you skipped quickly for help, did you? A. Yes. Q. How long after you set out for help was it be-

fore help arrived? A. It was not more than about fifteen or twenty minutes. Q. And then the number of those coming greatly increased? A. Yes. Q. What did they bring as weapons of war? A. Brought pails. Q. And shovels? A. No, I guess they didn't any of them have shovels. Q. Each brought pails with him? A. I guess they didn't all bring pails over. Q. And they carried water from the river? A. They had a spring there they got water out of. Q. During the night of the 4th and 5th was the fire pretty largely confined to logs and old stumps in which it had caught? A. Yes, old stumps and old logs burning."

As to extinguishing the fire on the 6th a witness testified: "Q. What did you do to try to extinguish this fire after you got down there? A. Carrying water and throwing piles apart."

There is also evidence that the fire burned in the shape of a horse shoe, starting at one heel and burning toward the river to the toe and then back to the other heel at the railroad track, and that it was 600 or 700 feet from where the fire started to where it stopped near the river bank.

The defendant also offered some evidence to the effect that the plaintiff stated that he thought from the condition of the wind that he would let the fire burn and do away with the rubbish on the side of the track. This statement is denied by plaintiff.

Plaintiff had been shipping wood previous years and some wood remained from the year before. There is no evidence that he did not ship out his wood as fast as he could dispose of it. The greater part of the wood was cut and piled by the track the winter before the fire.

I think it clear that there is an abundance of evidence to support a finding of the jury that there was no contributory negligence either before or after the fire. *Erd v. C. & N. W. R. Co.* 41 Wis. 65.

I think the case was properly disposed of below and that the judgment should be affirmed.

SIEBECKER, J.   I concur in the dissenting views of Mr.. Justice KERWIN.   I am persuaded that the evidence in the case fully sustains the ultimate fact found by the jury and approved by the trial court, that the plaintiff was not guilty of a want of ordinary care which proximately contributed to cause the destruction of his property.   Nor can I agree to the proposition, under the circumstances shown, that plaintiff as well as defendant ought reasonably to have anticipated the destruction of plaintiff's property from fire as a natural and probable result of the want of ordinary care in permitting combustible material to accumulate on its track. The plaintiff had the right to presume that defendant would perform its duty in protecting his property against loss by fire.   This duty imposes on the defendant an obligation to anticipate the natural and probable results of such negligence which is not imputable to plaintiff, because he had the right to rely on the fact that defendant would comply with the law and protect him.

A motion for a rehearing was denied and the following opinion was filed January 13, 1914:

BARNES, J.   An earnest and lawyerlike argument is made by respondent's counsel on a motion for rehearing.   A considerable portion of it is devoted to the negligence of the defendants.   There is no doubt that the evidence was sufficient to establish the fact that the plaintiff and the defendants were negligent in permitting the right of way to become littered up with highly combustible material, although it was not said in the opinion that plaintiff's negligence in this regard would defeat a recovery.

It is urged that the court in treating the question of contributory negligence started with a wrong premise, and that it reached a wrong conclusion whether the premise was right or wrong.

The court in the former opinion said:

"The jury found that the defendants ought reasonably to have anticipated under all the circumstances that the fire set might probably reach and burn the plaintiff's forest products as a natural and probable result.  If the defendants were bound to anticipate the burning of plaintiff's property, then assuredly the plaintiff was bound to anticipate that it would be burned as a natural and probable result of the fire."

The point is made that although the jury found that defendants ought reasonably to have anticipated that the fire set might probably burn the plaintiff's property, it did not and does not follow that plaintiff should reasonably have anticipated such a result.  The question submitted to the jury dealt with a fire already set.  The plaintiff knew the condition of the right of way for a long time.  He knew it was badly littered with combustible material.  He had been adding to the amount of it by piling rotten wood and peeling sound wood on it.  He knew the condition of his land on either side of the right of way and that it contained a lot of inflammable *débris*.  He, with two of his employees, was on the ground when the fire started, and they were there during the usual working hours most of the time until the fire reached the wood, some of them continuously.  He knew that the weather had been very dry for a long time.  He knew the wind had changed on the morning of May 6th so that it was blowing the fire directly toward the wood, and that it was only 300 or 400 feet therefrom on that morning. He knew that the defendants had not sent any one to put out the fire and had no reason for thinking that any one in authority knew of it, or intended to put it out if they did. The knowledge which the defendants had was imputable to them from the fact that the section crew passed by once or twice a day and a train passed by which did not stop at the siding.  Plaintiff knew of every fact about the fire that by any possibility the defendants or their agents or servants could have known or ought to have known.  He knew some

things that they did not know. He was a man of intelligence, apparently being an extensive buyer of forest products as well as a farmer. How it can be said on the state of this undisputed testimony that the defendants should reasonably anticipate that the fire which was burning might probably reach and burn the plaintiff's property, while the plaintiff should not reasonably anticipate such a result, passes our comprehension. The rule laid down deals with one element of negligence: reasonable anticipation of natural and probable results from known causes. What causes were known or should have been known by the defendants that were not in fact actually known by the plaintiff, and why was it not as obvious to the plaintiff, who was on the ground, that these causes would produce the results which they did, as it was to the defendants, if not more so? These questions, to our way of thinking, have not been and cannot be answered. The only attempt to answer them is the contention that it was the legal duty of the defendants to keep their right of way clear of rubbish, and, having failed to perform this duty, the appellant had the right to assume that defendants would put out the fire. This argument is no answer to the questions suggested, because it does not touch the question of what should reasonably be anticipated from known causes. Besides, the fire had been burning for two days and the defendants had done nothing in reference to it. They had no men on the ground and there was nothing to indicate that they intended to send any one there.

Under the decisions of this court, cited in the former opinion, it was the duty of the plaintiff, under the circumstances disclosed by the evidence and the finding of the jury referred to, to do what prudence required to preserve his property.

The evidence bearing on contributory negligence was all given by the plaintiff and his employees and is not in dispute. A majority of the court think that it raised no jury

question and that the verdict in this regard does not speak the truth. A minority of the court think otherwise. The evidence has been discussed at considerable length in the opinion of the court and in one of the dissenting opinions. The various facts which we think establish contributory negligence have been referred to in the former opinion. If all still find it difficult to say that the jury was warranted in of the circumstances but one were eliminated, we would exculpating the plaintiff from contributory negligence. We will briefly allude to it.

On the morning of May 6th the plaintiff knew that the wind had changed so as to blow the fire toward his wood; that the wind was brisk; that the fire was within a stone's throw of his wood; that there was an abundance of dry, inflammable material for it to feed on; that there was no one else on the ground, nor likely to be on it, to put the fire out, and that it might probably reach and burn his property within a short time if it was not checked. With this knowledge he did very little to check the spread of the fire and made no call for assistance until it got into his wood shortly after noon. During two or three hours of this critical time he kept his two employees doing their usual work in the wood yard and contenting themselves with looking at the fire occasionally. It may be that this is the kind of care the great mass of mankind would use when they saw a fire approaching which they knew might probably destroy their uninsured property if not checked. It may be that it was the exercise of due prudence for the plaintiff to do as he did. Our reason, experience, and judgment tell us that when property is threatened by fire or flood the generality of mankind do not act in any such way, unless perchance they are fully indemnified against loss by insurance and are indifferent about what becomes of their property. We have no other lamp to guide us in the solution of the question. We have re-examined the evidence, and adhere to the conclusion heretofore reached.

# ERRATUM.

Page 280—Lines 7 and 8 should be transposed.